RIBNIK *v.* McBRIDE, COMMISSIONER OF LABOR OF THE STATE OF NEW JERSEY.

No. 569. Argued April 26, 27, 1928.—Decided May 28, 1928.

*Messrs. John W. Simpson, 2d,* and *Walter G. Merritt* for plaintiff in error.

The plaintiff in error is deprived of rights of liberty and property secured by § 1 of the Fourteenth Amendment. *Brazee v. Michigan,* 241 U. S. 341; *Adams v. Tanner,* 244 U. S. 594; *Murphy v. California,* 225 U. S. 623; *Tyson v. Banton,* 273 U. S. 418; *Weller v. New York,* 268 U. S. 319; *German Alliance Ins. Co. v. Kansas,* 233 U. S. 389; *Wilson v. New,* 243 U. S. 332; *Wolff Packing Co. v. Industrial Court,* 262 U. S. 522; *Adkins v. Children's Hospital,* 261 U. S. 525; *Block v. Hirsh,* 256 U. S. 135; *Marcus Brown Co. v. Feldman,* 256 U. S. 170; *Ex parte Dickey,* 144 Cal. 234.

There is no monopoly, or danger of monopoly, in the operation of employment agencies. They are numerous, and it requires no great amount of capital to start new ones. Nineteen States have established competitive free state employment agencies, and in at least seven others there are municipal agencies. An organization has been established called the "American Association of Public Employment Offices," which is seeking to put the private agencies out of business. These facts appear in the publications utilized by Mr. Justice Brandeis in his dissenting opinion in *Adams v. Tanner, supra.* Business schools, trade schools, Y. M. C. A's, Y. W. C. A's, college bureaus,

typewriter companies, and bar associations, maintain agencies, while the " want " columns of newspapers contribute an entirely different kind of competition. It is also a well-known fact that the labor unions of the country frequently conduct employment offices, and that many large employers of labor secure their recruits through established employment departments. Under these conditions, it appears that the business of an employment agency is distinctly a private business of a highly competitive nature, with no known tendencies toward monopoly.

From the very nature of the business, there cannot be any uniformity in respect of the conditions under which it is carried on. An attempt to establish a uniform fee for the more valuable service and the less valuable service, without regard to the expenses of overhead—which make possible the more valuable service—would seem to be hopelessly impracticable within the limits of constitutional rights.

In a business like insurance, each single insurance contract is not a single and separate transaction, but is so involved that it affects the whole or a large part of the entire mass of insurance transactions. That is not true of employment agencies.

Employment agencies—and emphatically those dealing with clerical, engineering and executive positions—are certainly not as much affected with a public interest as wages and rentals; and this Court has held that price-fixing is not a valid exercise of the legislative power in those businesses, except temporarily in case of emergencies.

*Mr. Harry R. Coulomb,* Assistant Attorney General of New Jersey, with whom *Mr. Edward L. Katzenbach,* Attorney General, was on the brief, for defendant in error.

The business is one so involved with public interest and concern as to warrant its regulation by the State. *Brazee* v. *Michigan,* 241 U. S. 340; *Adams* v. *Tanner,* 242 U. S. 590.

A State may regulate fees to be charged by employment agencies. *Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517; *Brass* v. *North Dakota,* 153 U. S. 391; *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389.

In the above cases, this Court, in effect, held that the right to regulate rates or fees depended upon the necessity of so doing in order properly to regulate the business itself. In at least twenty-one States the amount of fee which may be charged is controlled either by fixing a specified fee for the service or limiting the charge to a percentage of the wages. It would thus appear that the regulation of the fee has been found essential to regulating the business. All of these States have, in effect, declared not only that the business has superimposed upon it a public interest requiring its regulation, but also that that public interest necessitates that the fees charged should be reasonable.

It can scarcely be argued that the action of the New Jersey legislature in limiting these fees was either unwise or arbitrary, in view of the nature of the business and the abuses which might result from unlimited charges. Cf. *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365.

The increase in urban population resulting in great bodies of unemployed in congested districts, and the consequent competition for employment, leading to compliance with any fee demanded by employment agencies, is ample reason for concluding that the public good required the regulation and justified the Act complained of.

Mr. Justice Sutherland delivered the opinion of the Court.

Chapter 227, Laws of New Jersey, 1918, p. 822, being an act to regulate the keeping of employment agencies, requires that every person operating an employment agency as defined by the statute must procure a license from the Commissioner of Labor. A penalty is imposed for failure to do so. The application for such license must be made in writing to the Commissioner of Labor and, among other requirements, the applicant must " file with the Commissioner of Labor, for his approval, a schedule of fees proposed to be charged for any services rendered to employers seeking employees, and persons seeking employment, and all charges must conform thereto. The schedule of fees may be changed only with the approval of the Commissioner of Labor." The Commissioner of Labor may refuse to issue or may revoke any license for any good cause shown within the meaning and purpose of the act.

Plaintiff in error filed with the state Commissioner of Labor a written application for a license to conduct an employment agency. All conditions of the statute were complied with; but the commissioner rejected the application upon the sole ground that, in his opinion, the fees proposed to be charged in respect of certain permanent positions were excessive and unreasonable. This action of the commissioner was brought up for review to the supreme court of the state, and that court construing the statute as empowering the commissioner to fix and limit the charges to be made by the applicant, nevertheless sustained it as constitutional under the due process of law clause of the Fourteenth Amendment. 4 N. J. Mis. R. 623. Upon appeal to the state court of errors and appeals, the judgment was affirmed. 103 N. J. L. 708.

That the state has power to require a license and regulate the business of an employment agent does not admit of doubt. But the question here presented is whether the due process of law clause is contravened by the legislation attempting to confer upon the Commissioner of Labor power to fix the prices which the employment agent shall charge for his services. The question calls for an answer under the last of the three categories set forth by this Court in *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 535, that is to say: Has the business in question been devoted to the public use and an interest in effect granted to the public in that use? Or, in other words, is the business one " affected with a public interest," within the meaning of that phrase as heretofore defined by this Court? As was recently pointed out in *Tyson & Brother* v. *Banton,* 273 U. S. 418, 430, the phrase is not capable of exact definition; but, nevertheless, under all the decisions of this Court from *Munn* v. *Illinois,* 94 U. S. 113, it is the standard by which the validity of price-fixing legislation, in respect of a business like that here under consideration, must be tested.

In the *Tyson* case it was said (p. 430) that the interest meant was not " such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business; and while the word has not always been limited narrowly as strictly denoting ' a right,' that synonym more nearly than any other expresses the sense in which it is to be understood." The business must be such (p. 434) " as to justify the conclusion that it has been *devoted* to a public use and its use thereby, in effect, *granted* to the public." And again (p. 438) after reviewing former decisions, it was said that " each of the decisions of this court upholding governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, has turned

upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use."

In *Wolff Co.* v. *Industrial Court, supra,* p. 537, it was said:

" It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. . . . one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances."

In *Adkins* v. *Children's Hospital,* 261 U. S. 525, this Court had under consideration an act of Congress fixing minimum wages for women and children in the District of Columbia. The legislation, so far as it affected women, was held invalid as contravening the due process of law clause of the Fifth Amendment, because it was an arbitrary interference with the right to contract in respect of terms of private employment. It was said (p. 546) that while there was no such thing as absolute freedom of contract, nevertheless, freedom of contract was the general rule and restraint the exception; and that " the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances."

The business of securing employment for those seeking work and employees for those seeking workers is essentially that of a broker, that is, of an intermediary. While we do not undertake to say that there may not be a deeper concern on the part of the public in the business of an employment agency, that business does not differ in sub-

stantial character from the business of a real estate broker, ship broker, merchandise broker or ticket broker. In the *Tyson* case, *supra*, we declared unconstitutional an act of the New York legislature which sought to fix the price at which theatre tickets should be sold by a ticket broker, and it is not easy to see how, without disregarding that decision, price-fixing legislation in respect of other brokers of like character can be upheld.

An employment agency is essentially a private business. True, it deals with the public, but so do the druggist, the butcher, the baker, the grocer, and the apartment or tenement house owner and the broker who acts as intermediary between such owner and his tenants. Of course, anything which substantially interferes with employment is a matter of public concern, but in the same sense that interference with the procurement of food and housing and fuel are of public concern. The public is deeply interested in all these things. The welfare of its constituent members depends upon them. The interest of the public in the matter of employment is not different in quality or character from its interest in the other things enumerated; but in none of them is the interest that " public interest " which the law contemplates as the basis for legislative price control. *Wolff Co.* v. *Industrial Court, supra,* p. 536. Under the decisions of this Court it is no longer fairly open to question that, at least in the absence of a grave emergency, *Tyson & Brother* v. *Banton, supra,* pp. 431, 437, the fixing of prices for food or clothing, of house rental or of wages to be paid, whether minimum or maximum, is beyond the legislative power. And we perceive no reason for applying a different rule in the case of legislation controlling prices to be paid for services rendered in securing a place for an employee or an employee for a place.

*Brazee* v. *Michigan,* 241 U. S. 340, cited by defendant in error lends no support to the judgment below. That

case involved the validity of a Michigan statute in respect of employment agencies. Section 5 of the act attempted to limit the fees which should be charged. The state supreme court held that the business was one properly subject to police regulation and control, but did not rule concerning the validity of § 5. This Court held that it was within the power of the state to require licenses for employment agencies and prescribe reasonable regulations to be enforced by the Commissioner of Labor. But it was said (p. 344):

. "Provisions of § 5 in respect of fees to be demanded or retained are severable from other portions of the act and, we think, might be eliminated without destroying it. Their validity was not passed upon by the Supreme Court of the State and has not been considered by us."

And we since have held definitely that the power to require a license for and to regulate the conduct of a business is distinct from the power to fix prices. "The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on." *Tyson & Brother* v. *Banton, supra*, p. 431; and see pp. 440–441.

To urge that extortion, fraud, imposition, discrimination and the like have been practiced to some, or to a great, extent in connection with the business here under consideration, or that the business is one lending itself peculiarly to such evils, is simply to restate grounds already fully considered by this Court. These are grounds for regulation but not for price fixing, as we have already definitely decided. *Tyson & Brother* v. *Banton, supra,* 442–445.

There are a number of states which have statutes like that now under consideration, and we are asked to give weight to that circumstance. It is to be observed, how-

ever, that with the exception of the decision now under review none of these statutes has been judicially considered, except in the State of California, where the legislation was declared unconstitutional. *Ex parte Dickey,* 144 Cal. 234; *In re Smith,* 193 Cal. 337. And it was said in oral argument, and not disputed, that, while legislation of this character existed in several states, generally it was not enforced, in some instances because the state's attorney-general had advised that the legislation was unconstitutional. In any event, under all the circumstances, and in the face of our prior decisions, we do not regard the mere existence in other states of statutory provisions like the one now under review as entitled to persuasive force.

*Judgment reversed.*

MR. JUSTICE SANFORD, concurring.

I concur in this result upon the controlling authority of *Tyson* v. *Banton,* 273 U. S. 418, which, as applied to the question in this case, I am unable to distinguish.

MR. JUSTICE STONE, dissenting.

The question is whether a state has constitutional power to require employment agencies to charge only reasonable fees for their services to those seeking employment. As the case is presented we must take it that the New Jersey Commissioner of Labor was right in holding that Ribnik's list of fees was unreasonably high.

Under the decisions of this Court not all price regulation, as distinguished from other forms of regulation, is forbidden. As those decisions have been explained, price regulation is within the constitutional power of a state legislature when the business concerned is " affected with a public interest." That phrase is not to be found in the Constitution. Concededly it is incapable of any precise definition. It has and can have only such meaning as

may be given to it by the decisions of this Court. As I read those decisions, such regulation is within a state's power whenever any combination of circumstances seriously curtails the regulative force of competition, so that buyers or sellers are placed at such a disadvantage in the bargaining struggle that a legislature might reasonably anticipate serious consequences to the community as a whole. *Munn* v. *Illinois,* 94 U. S. 113; *Brass* v. *Stoeser,* 153 U. S. 391; *German Alliance Insurance Co.* v. *Kansas,* 233 U. S. 389, 409; *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252; *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242; see also *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13; *McLean* v. *Arkansas,* 211 U. S. 539; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225; *Frisbie* v. *United States,* 157 U. S. 160. The price regulation may embrace businesses "which though not public in their inception may fairly be said to have risen to be such and have become subject in consequence to some governmental regulation." *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 535. The use by the public generally of the specific thing or business affected is not the test. The nature of the service rendered, the exorbitance of the charges and the arbitrary control to which the public may be subjected without regulation, are elements to be considered in determining whether the "public interest" exists. *Wolff Co.* v. *Industrial Court, supra,* 538. The economic disadvantage of a class and the attempt to ameliorate its condition may alone be sufficient to give rise to the "public interest" and to justify the regulation of contracts with its members, *Knoxville Iron Co.* v. *Harbison, supra; McLean* v. *Arkansas, supra; Mutual Loan Co.* v. *Martell, supra,* and obviously circumstances may so change in point of time or so differ in space as to clothe a business with such an interest which at other

times or in other places would be a matter purely of private concern. *Block* v. *Hirsh, supra,* 155.

I cannot say *a priori* that the business of employment agencies in New Jersey lacks the requisite "public interest." We are judicially aware that the problem of unemployment is of grave public concern; that the conduct of the employment agency business bears an important relationship to that larger problem and affects vitally the lives of great numbers of the population, not only in New Jersey but throughout the United States; that employment agencies, admittedly subject to regulation in other respects, *Brazee* v. *Michigan,* 241 U. S. 340, and in fact very generally regulated, deal with a necessitous class, the members of which are often dependent on them for opportunity to earn a livelihood, are not free to move from place to place, and are often under exceptional economic compulsion to accept such terms as the agencies offer. We are not judicially ignorant of what all human experience teaches, that those so situated are peculiarly the prey of the unscrupulous and designing. In *Adams* v. *Tanner,* 244 U. S. 590, a statute of Washington which in effect attempted to abolish the business was held unconstitutional because employment agencies were deemed not "inherently immoral or dangerous to public welfare," but, as was there emphasized, capable, under regulation, of being conducted in a useful and honest manner. But it was not questioned that the business was subject to grave abuses, involving frauds and impositions upon a peculiarly helpless class, among which the exaction of exorbitant fees was perhaps the least offensive. The Supreme Court of New Jersey, in an opinion in the present case which was adopted by the Court of Errors and Appeals, said: "It is common knowledge that an employment agency is a business dealing with a great body of our population, native and foreign born, which is

susceptible to imposition, deception and immoral influences. . . ."

In dealing with the question of power to require reasonable prices in this particular business, we should remember what was specifically pointed out by the Court in *Tyson* v. *Banton,* 273 U. S. 418, 438, that whether a business is affected with a "public interest" turns "upon the existence of conditions, peculiar to the business under consideration." In the respects mentioned, or most of them, and in others to be pointed out, it seems to me that there is a marked difference between the character of this business and that of real estate brokers, ship brokers, merchandise brokers, and, more than all, of ticket brokers, who were involved in *Tyson* v. *Banton, supra.* There the attempt was made to limit the advance which brokers might charge over box office prices for theatre tickets, an expedient adopted to break up their monopolistic control of a luxury, not a necessity. Those affected by the practices of the ticket brokers constituted a relatively small part of the population within a comparatively small area of the State of New York. They were not necessitous. The consequences of the fraud and extortion practiced upon them were not visited upon the community as a whole in any such manner as are fraud and imposition practiced upon workers seeking employment. Here the effort is made, as in *Knoxville Iron Co.* v. *Harbison, supra; McLean* v. *Arkansas, supra; Mutual Loan Co.* v. *Martell, supra; Erie R. R.* v. *Williams,* 233 U. S. 685, first, to protect from abuses a class unable to protect itself, for whose welfare the police power has often been allowed broad play, and, second, to mitigate the evils which unemployment brings upon the community as a whole.

Some presumption should be indulged that the New Jersey legislature had an adequate knowledge of such local conditions as the circumstances of those seeking employ-

ment, the number and distribution of employment agencies, the local efficacy of competition, the prevalent practices with respect to fees. On this deserved respect for the judgment of the local lawmaker depends, of course, the presumption in favor of constitutionality, for the validity of a regulation turns " upon the existence of conditions, peculiar to 'the business under consideration." *Tyson* v. *Banton, supra,* 438. Moreover, we should not, when the matter is not clear, oppose our notion of the seriousness of the problem or the necessity of the legislation to that of local tribunals. "This Court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt." *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544. And the enactments of state legislatures are entitled to no less respect. If, therefore, our consideration of the general conditions surrounding employment agencies, which it was thought in *Brazee* v. *Michigan, supra,* made them subject to regulation, was to go no further than that of the Court, I should still have supposed that plaintiff in error had not sustained the burden which rests on him to show that this law is unconstitutional. *Erie R. R.* v. *Williams, supra.* But even if the presumption is not to be indulged, and the burden no longer to be cast on him who attacks the constitutionality of a law, we need not close our eyes to available data throwing light on the problem with which the legislature had to deal. See *Muller* v. *Oregon,* 208 U. S. 412, 420–421; *McLean* v. *Arkansas, supra,* 549.

For thirty years or more the evils found to be connected with the business of employment agencies in the United States have been the subject of repeated investigations, official and unofficial, and of extensive public comment. They have been the primary reason for the

establishment of public employment offices in the various States.[1]

Quite apart from the other evils laid at the door of the private agencies,[2] the data supplied by these investigations and reports afford a substantial basis for the conclusion of the New Jersey legislature that the business is peculiarly subject to abuses relating to fee-charging, and

---

[1] As early as 1912 free employment offices were maintained by at least fifteen states,—Colorado, Connecticut, Illinois, Indiana, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Ohio, Oklahoma, Rhode Island, West Virginia, Wisconsin; and by municipalities in California, Montana, New Jersey and Washington. The State of New York had maintained an office in New York City as early as 1896; and in Nebraska a statute providing for an office had been passed but no appropriation had been made for its maintenance. See Statistics of Unemployment and the Work of Employment Offices, U. S. Bur. of Labor, Bull. No. 109, pp. 35, 36. The authors of the inquiry conducted for the Russell Sage Foundation reported, "One conclusion drawn from [our] findings has been that we must have public bureaus to take the place of the private fee-charging agencies. That is, in so far as people are informed on the question and have expressed their sentiments; most of them appeared convinced that we should have public employment bureaus because of the abuses of some fee-charging agencies quite regardless of other considerations. In addition, however, the feeling has been growing that this service in the nature of the case should be free, and that the very fact of fee-charging carries with it a dangerous temptation to abuse and fraud." Public Employment Offices, Harrison and others (1924) p. 5. Compare Report of New Jersey Bureau of Statistics of Labor and Industries, 1893, pp. 73–78.

[2] The numerous governmental reports on the undesirable practices of the agencies, other than those relating to fee-charging and therefore not directly material here, are summarized in the opinion of Mr. Justice Brandeis in *Adams* v. *Tanner*, 244 U. S. 590, 597–616. See also Public Employment Exchanges, Report of City Club of New York, 1914; Labor Exchanges, J. B. Andrews, 63d Cong., 3d Sess., Sen. Doc. No. 956; Free Public Employment Offices, U. S. Bureau of Labor Statistics, Bulletin No. 68, pp. 1–6; Proceedings, Ninth Annual Convention, Association of Governmental Labor Officials, 1923, U. S. Bureau of Labor Statistics No. 323, pp. 71, 72.

that for the correction of these the restriction to a reasonable maximum charge is the only effective remedy. These data, to be gathered from numerous independent and public investigations, may be briefly summarized as follows:

*First.* They show that the agencies, left to themselves, very generally charge extortionate fees. The Commission on Industrial Relations, created by Act of August 23, 1912, c. 351, 37 Stat. 415, reported to Congress at a time when prices were materially lower than today, "Fees are often charged out of all proportion to the service rendered. We know of cases where $5, $9, $10, and even $16 a piece has been paid for jobs at common labor. In one city the fees paid by scrubwomen is at the rate of $24 a year for their poorly paid work." [3] Exorbitant fees are taken for merely registering the applicants, no effort whatever being made to find them work.[4] To stimulate

[3] Report of Commission on Industrial Relations, 64th Cong., 1st Sess., Sen. Doc. No. 415, Vol. I, p. 109. See also Vol. II, pp. 1168, 1169; Monthly Labor Review, Bureau of Labor Statistics, October, 1922, p. 15. In California during 1920 the average fee charged by clerical agencies was 30% of the first month's wages. Report of California Bureau of Labor Statistics, 1919–1920. See Report of Massachusetts Commission on Immigration, 1914, pp. 38–47.

[4] Employment Bureaus, Willoughby, Monographs on American Social Economics, No. VI, U. S. Commission to the Paris Exposition of 1900, pp. 3–4. See Report of Illinois Free Employment Offices, 1900, *passim; id.,* 1907, p. 71; Pennsylvania Dept. of Labor and Industry, Bulletin, 1920, Vol. 7, No. 5, pp. 7–15; Report of Iowa Bureau of Labor Statistics, 1890, pp. 217–240; Report of New York Industrial Commissioner, 1922, p. 23; Proceedings, American Association of Public Employment Officers, 1913, 1914, 1915, U. S. Bureau of Labor Statistics, Bulletin No. 192, pp. 79, 80; Hearings on H. R. 16130 before House Committee on Labor, 63d Cong., 2d Sess., Part I; Hearings on S. 688, S. 1442, H. R. 4305 before Joint Committees on Labor, 66th Cong., 1st Sess., Part I.

In Public Employment Offices in the United States, U. S. Bureau of Labor Statistics, Bull. No. 241 (1918) p. 6, it is declared: "If the

the payment of such fees the agencies advertise for classes of laborers for whom no jobs are available.[5] According to the Massachusetts Commission to Investigate Employment Offices, the ordinary forces of competition seem powerless to prevent or remedy this situation, because but little capital is required to open an office, and because the clients of the agencies are constantly new.[6]

*Second.* These data show that the fees charged are often discriminatory. It is made known in slack season that but few jobs are available and that to these will be referred the applicants who tender the larger " extra fees "

private employment agencies had been conducted with ordinary honesty and efficiency, the striving for a greater degree of justice to the worker would not have been able to make any headway against the accepted doctrine of individualism, which assumes that privately conducted businesses are always preferable to publicly conducted businesses. The irregularities and abuses of the private employment agencies, however, became too notorious to be overlooked.

" The charges usually preferred against private employment agencies concern the fees exacted, the practices in referring applicants to jobs, and the places where the employment agencies are frequently located. Fees for registration were, and still are, charged by many private employment agencies, although these agencies make no effort to render any service in return for the fee. If the registered applicant makes a complaint, he is asked to pay an extra fee on the promise of getting first consideration. The fees charged are oftentimes exorbitant."

[5] Employment Bureaus, Willoughby, supra, pp. 3-4. The Act of June 19, 1906, c. 3438, 34 Stat. 304, 307, enacted by Congress for the District of Columbia, requires (§ 8) a refund of one-half the fee if a fair opportunity for employment is not secured within four days; and provides that " the whole fee and any sums paid by the applicant for transportation in going to and returning from such employer shall be refunded within four days of demand, if no employment of the kind applied for was vacant at the place to which the applicant was directed."

[6] Report of Mass. Commission to Investigate Employment Offices (1911) p. 15.

or " presents." [7] There is ground for the belief that this is a particular danger in New Jersey, for a large proportion of its agencies specialize in employees for hotels and resorts where the positions are seasonal and temporary.[8] The whole supply of labor must, at the beginning and again at the end of the season, search for new positions at the same time.

*Third.* Fee-splitting has been a recurrent subject of complaint. It " is frequently practiced, part of the fee charged to the worker being paid over by the private employment agent to the employer or his foreman. This practice is closely akin to job selling by foremen and superintendents. . . . Both 'fee-splitting' and 'job-selling' result in short time employment and frequent discharges, for each time a job is filled a new fee is 'split' or a fresh price exacted. The resultant wastage from accelerated labor turnover, from extortionate and multiplied fees, from demoralization of workers, from unemployment and irregularity of employment is incalculably great."

[7] Statistics of Unemployment and the Work of Employment Offices, U. S. Bureau of Labor Bulletin No. 109, p. 36.

[8] In 1920 thirty out of the ninety-two agencies in the state were of that type. Report of New Jersey Dept. of Labor, 1921, pp. 59–60. Legislation enacted in New Jersey in 1907 which left the regulation of employment agencies to the municipalities was found in practice to be ineffective because of the laxity of local enforcement. Report of New Jersey Commission of Immigration, 1914, pp. 57–66.

During a labor shortage the private agencies in New Jersey have been found to use a different device to stimulate fees artificially. After the war many of the women drawn by it into industry failed to return to domestic work. In the consequent shortage of domestics, the agencies encouraged women to change jobs, collecting a new fee at each change. Report of New Jersey, Dept. of Labor, 1919, pp. 144–146. Section 9 of the act provided by Congress for the District of Columbia, *supra*, provides, " That no such person [*i. e.*, licensed employment agent] shall induce or attempt to induce any domestic employee to leave his employment with a view to obtaining other employment through such agency."

Public Employment Offices in the United States, U. S.
Bureau of Labor Statistics Bulletin No. 241 (1918) p. 6.[9]
While their fees are unregulated, the private agencies are
free to charge those seeking employment enough to cover
both the charge for their service and the gratuity paid
to the foreman or employer. A legislature would cer-
tainly not be unreasonable in concluding that the fixing
of a reasonable maximum fee was the appropriate and
only effective method of assuring private agencies fair
compensation while preventing them from abuses of this
character.

*Fourth.* It is reported that at times of widespread un-
employment the private agencies are known to raise their
fees out of all proportion to the reasonable value of their
services.[10] There is a public interest at such times in

---

[9] This practice has been reported as prevalent in railroad building
where it is known as the "three gang system"—at any one time
there is one gang, just discharged, on its way home; another at work
but on the point of being dismissed; a third, hired by the agency and
on its way to the job. See Public Employment Offices, Harrison and
others, *supra*, p. 550. Compare Report of U. S. Bureau of Immi-
gration, 1907, pp. 70–71; *id.*, 1911, pp. 121–122; Report of U. S.
Immigration Commission, 61st Cong., 3d Sess., Sen. Doc. No. 747,
Vol. II, pp. 321; 391–408; 443–449.

The Congressional act passed for the District of Columbia, *supra*,
provides (§ 8): "No such licensed person shall divide fees with con-
tractors or their agents or other employers or anyone in their employ
to whom applicants for employment are sent."

[10] "In the summer, when employment is plentiful, the fees are as
low as 25¢, and men are even referred to work free of charge. But
this must necessarily be made up in winter when work is scarce. At
such times, when men need work most badly, the private employment
offices put up their fees and keep the unemployed from going to work
until they can pay $2, $3, $5 and even $10 and more for their jobs.
This necessity of paying for the privilege of going to work, and pay-
ing more the more urgently the job is needed, not only keeps people
unnecessarily unemployed, but seems foreign to the spirit of Ameri-
can freedom and opportunity." Report of Commission on Industrial
Relations, 64th Cong., 1st Sess., Sen. Doc. No. 415, Vol. I, p. 110.

bringing about a prompt readjustment of the labor supply to industry's need for labor. The additional barrier to a quick readjustment created by the agencies' raising of their rates affects that interest adversely. The establishment of a reasonable maximum rate [11] is well calculated to obviate the abuse.

*Fifth.* Finally, it is pointed out that the private agencies charge the employee and do not charge the employer for a service that is rendered to both. The convenience of being furnished with employees is similar to that of being directed to a position; but less effort is required to collect compensation for the whole service from the employee alone. His necessities are normally greater. His bargaining power is normally weaker. The setting of a maximum fee need not mean—in New Jersey, does not mean—that an absolute limit is placed on the agency's return. The agency may still charge the employer in addition for such service as is rendered to him.[12] The establishment of reasonable fees is thus, in one aspect, merely a method of

[11] The usual practice of the legislatures is, of course, not to fix one fee to be charged regardless of the type of position furnished, but to group employment offices according to their classes of clients and promulgate different fee schedules for the different groups. See Report of Massachusetts Commission to Investigate Employment Offices, 1911, pp. 26–28.

[12] Some agencies have already done so. Report of Massachusetts Commission to Investigate Employment Offices, 1911, p. 29. Compare Report of Commission on Industrial Relations, 64th Cong., 1st Sess., Sen. Doc. No. 415, Vol. I, p. 110. The act of Congress to regulate agencies in the District of Columbia limited the fee which the agencies might charge employers as well as that chargeable to those seeking positions Act of June 19, 1906, c. 3438, § 8, 34 Stat. 304, 307. In Massachusetts the municipalities were empowered by statute to regulate the fees of the agencies. Mass. Rev. Laws (1902) c. 102; Mass. Acts (1920) c. 216. In December, 1920, the ordinances in force in Boston permitted domestic and common labor agencies to collect, both from the employer and the employee, only 25% of the first week's wages. U. S. Bureau of Labor Statistics, Monthly Labor Review, October, 1922, p. 7. In Oklahoma fees may not be collected

providing that the patrons of the agency shall be required to pay only for the service rendered to them.

Legislation for the correction of these and other evils has been general throughout the United States.[13] Among the earliest comprehensive schemes for that purpose was the Act of June 19, 1906, c. 3438, 34 Stat. 304, adopted by Congress for the District of Columbia.[14] For numer-

both from the employer and the employee; but the amount the employee may be charged is limited to a percentage of his first month's salary. Okla. Acts (1917) c. 181.

[13] Thirty-nine states have enacted statutes regulating or taxing private employment agencies; only Alabama, Arizona, Delaware, Florida, Mississippi, North Dakota, New Mexico, South Carolina and Vermont are without state laws on the subject, and in some of these the agencies are taxed by municipalities. See U. S. Bureau of Labor Statistics, Monthly Labor Review, October, 1922, p. 1; N. C. Acts, 1925, c. 127. In Canada the agencies are subject to rigorous regulation, including the fixing of their charges. Employment Agencies Act, May 1, 1914, Provincial Act 4 Geo. V, c. 38; see Report of Ontario Commission on Unemployment, 1916, pp. 41, 121–123; Report of Trades and Labor Branch, Dept. of Public Works, Province of Ontario, 1917, pp. 88–91; Lescohier, The Labor Market (1919) pp. 150–153.

General systems of regulation, with such provisions as the requirement of bonds, the publication and filing of fee schedules, the payment of license fees, etc., but without limitation of the fees that may be charged applicants, are in force in Alabama, Gen. Laws (1923) No. 181; Florida, Rev. Gen. Stat. (1920) § 888; Georgia, Code (1926) § 2158(32)B; Kentucky, Stat. (1903) § 3011; Louisiana, Stat. (Wolff, 1920) pp. 1100–1102; Maryland, Annot. Code (Bagby, 1924) art. 56, § 232; Minnesota, Gen. Stat. (1923) §§ 4246, 4247; New Hampshire, Pub. Laws (1926) c. 179; Washington, Code (Pierce, 1919) § 8876; West Virginia, Code (Barnes, 1923) c. 32, §§ 1, 109. An Idaho statute purports to abolish private agencies. Idaho Comp. Stat. (1919) §§ 2297, 2308–2310. A similar statute, Wash. Laws (1915) 1, was declared unconstitutional in *Adams* v. *Tanner*, 244 U. S. 590.

[14] The rates legally chargeable were increased by Act of February 20, 1909, c. 166, 35 Stat. 641, which left the other material provisions of the original act unchanged.

ous classes of employees (including all domestic servants and farm help) it regulates (§ 8) not only the fee which may be charged to the applicant for work, but also the amount that the agency may receive from the employer. It requires a refund of half the fee if a fair opportunity for work is not secured in four days, and a refund of the whole fee and transportation expenses if no employment of the kind asked was vacant at the place to which the applicant was directed.

Among the states, twenty-one have limited the total fees that may be charged, ten by fixing a stated maximum,[15] and eleven by restricting the charge to a named percentage of the salary earned during some period.[16] In eight states the maximum registration fee is fixed by statute, and that fee is required to be returned if no work is found for the applicant.[17] In seventeen states if no

---

[15] Colo. Comp. Laws (1921) § 4296; Me. Rev. Stat. (1916) c. 42, as amended by Laws (1917) c. 139; Mass. Gen. Laws (1921) c. 140, §§ 41–46, 202–205 (operating under these sections the municipalities fix the rates, U. S. Bureau of Labor Statistics, Monthly Labor Review, October, 1922, p. 7); Mont. Rev. Codes (1921) §§ 4157–4172; Ohio Gen. Code (1926) §§ 886–897; Pa. Stat. (1920) §§ 10130–10164; R. I. Gen. Laws (1923) c. 51, § 18; S. Dak. Acts (1919) c. 190; Tex. Rev. Civ. Stat. (1925) Title 83, c. 13; Wis. Stat. (1927) c. 105.

[16] Calif. Gen. Laws (Hillyer, Supp. 1921–1925) c. 102, § 11½; Conn. Labor Laws (Revision of 1920) §§ 2333–2337; Ind. Annot. Stat. (Burns, 1914) §§ 7131a–7131i, as amended by Acts (1921) p. 263; Iowa Acts (1925) c. 39; Mich. Acts (1925) No. 255; Neb. Comp. Stat. (1922) § 7734; N. Y. Gen. Bus. Law, § 185; N. Car. Pub. Laws (1925) c. 127; Okla. Comp. Stat. (1921) §§ 7184–7207; Ore. Laws (Olson, 1920) Title 38, c. 10; Utah Comp. Laws (1917) §§ 2440–2458, 3076(6), as amended by Laws (1919) c. 130, and Laws (1921) c. 48, 49.

[17] Ark. Acts (1917) No. 11; Colo. Comp. Laws (1921) § 4296; Ill. Rev. Stat. (1927) c. 48, § 79 (fee limited but not returnable); Kan. Rev. Stat. (1923) 44–407; Mo. Rev. Stat. (1919) § 6751; Neb. Comp. Stat. (1922) §§ 7720, 7734; Va. Code (1924) § 1803; Wyo. Comp. Stat. (1920) § 3468.

work is furnished the agency must return the entire fee collected.[18]

It is of course true that the enactment of a particular type of legislation, even though general, and a widespread and competent opinion that it is wise and necessary, do not establish its constitutionality. But that such legislation has been enacted and continued in force over considerable periods of time and in widely separated areas, and is supported by a concurrence of informed opinion, may not be disregarded in determining, first, whether the conditions peculiar to the business under consideration make it one in which, as in insurance companies, there is a paramount public concern; and, second, whether the regulation adopted is reasonably calculated to safeguard that interest. See *Muller* v. *Oregon, supra,* 420–421; *McLean* v. *Arkansas, supra.*

Examination of the various reports of public bodies and the legislation referred to can, I think, leave no doubt that the practices of the private agencies with respect to their fees presented a problem for legislative consideration different from any other that this Court has passed on in ruling on the power to regulate prices, but certainly more akin to that in *Munn* v. *Illinois, supra,* and *German Alliance Insurance Co.* v. *Kansas, supra,* than to that in *Tyson* v. *Banton, supra,* and, unless we are to establish once and for all the rule that only public utilities may be

---

[18] Calif. Stat. (1913) c. 282, Stat. (1915) c. 551, Stat. (1923), c. 413; Ill. Rev. Stat. (1927) c. 48, § 79 ($2 may be retained as a registration fee); Iowa Code (1924) § 1546 (a small fixed sum may, however, be retained as a registration fee); Kan. Acts (1911) c. 187; Mass. Gen. Laws (1921) c. 140 (under municipal regulations); Me. Rev. Stat. (1916) c. 42; Mo. Rev. Stat. (1919) §§ 6751–6755; Mont. Rev. Codes (1921) § 4164; Nev. Rev. Laws (1919) p. 2783, § 10; N. Y. Gen. Bus. Law, § 186; Okla. Comp. Stat. (1921) § 7185; Ore. Laws (Olson, 1920) Title 38, c. 10, § 6730; Pa. Stat. (1920) § 10142; S. Dak. Acts (1919) c. 190; Tenn. Acts (1917) c. 78; Va. Code (1924) § 1803; Wyo. Comp. Stat. (1920) § 2468.

regulated as to price, the validity of the statute at hand would seem to me to be beyond doubt. Certainly it would be difficult to show a greater necessity for price regulation.

It is said that if there be abuses in this business, the business may be regulated but not by the fixing of reasonable prices, and that that was decided in *Tyson* v. *Banton, supra.* So far as the significant facts in that case are concerned, it bears little resemblance to this one. Ticket brokers and employment brokers are similar in name: in no other respect do they seem alike to me. To overcharge a man for the privilege of hearing the opera is one thing; to control the possibility of his earning a livelihood would appear to be quite another. And I shall not stop to argue that the state has a larger interest in seeing that its workers find employment without being imposed upon, than in seeing that its citizens are entertained. Here, too, if the business is subject to regulation, as seems to be admitted, the regulation which is appropriate and effective is some curtailment of the exorbitant fees charged and not some other form of control which would have no tendency to correct the evils aimed at.

I cannot accept as valid the distinction on which the opinion of the majority seems to me necessarily to depend, that granted constitutional power to regulate there is any controlling difference between reasonable regulation of price, if appropriate to the evil to be remedied, and other forms of appropriate regulation which curtail liberty of contract or the use and enjoyment of property. Obviously, even in the case of businesses affected with a public interest, other control than price regulation may be appropriate, and price regulation may be so inappropriate as to be arbitrary or unreasonable, and hence unconstitutional. To me it seems equally obvious that the Constitution does not require us to hold that a business, subject to every other form of reasonable regulation,

is immune from the requirement of reasonable prices, where that requirement is the only remedy appropriate to the evils encountered. In this respect I can see no difference between a reasonable regulation of price and a reasonable regulation of the use of property, which affects its prices or economic return. The privilege of contract and the free use of property are as seriously cut down in the one case as in the other.

To say that there is constitutional power to regulate a business or a particular use of property because of the public interest in the welfare of a class peculiarly affected, and to deny such power to regulate price for the accomplishment of the same end, when that alone appears to be an appropriate and effective remedy, is to make a distinction based on no real economic difference, and for which I can find no warrant in the Constitution itself nor any justification in the opinions of this Court.

The price paid for property or services is only one of the terms in a bargain; the effect on the parties is similar whether the restriction on the power to contract affects the price, or the goods or services sold. Apart from the cases involving the historic public-callings, immemorially subject to the closest regulation, this Court has sustained regulations of the price in cases where the legislature fixed the charges which grain elevators, *Brass* v. *Stoeser, supra; Budd* v. *New York,* 143 U. S. 517, and insurance companies might make, *German Alliance Insurance Co.* v. *Kansas, supra;* or required miners to be paid per ton of coal unscreened instead of screened, *McLean* v. *Arkansas, supra; Rail Coal Co.* v. *Ohio Industrial Commission,* 236 U. S. 338; or required employers who paid their men in store orders to redeem them in cash, *Knoxville Iron, Co.* v. *Harbison, supra; Dayton Coal Co.* v. *Barton,* 183 U. S. 23; *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224; or fixed the fees chargeable by attorneys appearing for injured employees before workmen's compensation commissions,

*Yeiser* v. *Dysart,* 267 U. S. 540; or fixed the rate of pay for overtime work, *Bunting* v. *Oregon,* 243 U. S. 426; or fixed the time within which the services of employees must be paid for, *Erie R. R.* v. *Williams, supra;* or established maximum rents, *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; or fixed the maximum rate of interest chargeable on loans, *Griffith* v. *Connecticut,* 218 U. S. 563. It has sustained restrictions on the other element in the bargain where legislatures have established maximum hours of labor for men, *Holden* v. *Hardy,* 169 U. S. 366, or for women, *Muller* v. *Oregon,* 208 U. S. 412; *Hawley* v. *Walker,* 232 U. S. 718; *Riley* v. *Massachusetts,* 232 U. S. 671; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S. 385; or prohibited the payment of wages in advance, *Patterson* v. *Bark Eudora,* 190 U. S. 169; *Strathearn S. S. Co.* v. *Dillon,* 252 U. S. 348; or required loaves of bread to be of a certain size, *Schmidinger* v. *Chicago,* 226 U. S. 578. In each of these cases the police power of the state was held broad enough to warrant an interference with free bargaining in cases where, despite the competition that ordinarily attends that freedom, serious evils persisted.

Similar evils are now observed in the conduct of employment agencies. I see no reason why a state may not resort to the same remedy. There may be reasonable differences of opinion as to the wisdom of the solution here attempted. These I would be the first to admit. But a choice between them involves a step from the judicial to the legislative field. *Erie R. R.* v. *Williams, supra,* 699; *German Alliance Ins. Co.* v. *Kansas, supra; Munn* v. *Illinois, supra,* 132. That choice should be left where, it seems to me, it was left by the Constitution— to the States and to Congress.

Mr. Justice Holmes and Mr. Justice Brandeis join in this dissent.