THIRD JUDICIAL DISTRICT COURT OF BERGEN COUNTY.

STATE OF NEW JERSEY, PLAINTIFF, v. PACKARD-BAMBERGER & COMPANY, INCORPORATED, A NEW JERSEY CORPORATION, DEFENDANT.

Decided October 24, 1938.

For the plaintiff, *Meyer Pesin*.

For the defendant, *Losche & Mounier*.

VORSANGER, D. C. J.   This is a case on motion to dismiss the complaint, based on information and belief, in an action wherein the State of New Jersey appears as plaintiff, and Packard-Bamberger & Co., Inc., a New Jersey corporation, as defendant.

The action is based upon section 2 of the laws of 1938, chapter 394, known as the "Fair Sales act," providing:

"It is hereby declared that the advertisement, offer for sale, or sale of any merchandise at less than cost by retailers is prohibited."

The act further states that any such suit may be instituted in a District Court in any city, or Judicial District in any county "* * * upon filing of a complaint in writing, duly verified, * * *."

The defendant moves to strike the complaint on two grounds:

1. That the complaint does not set forth a valid cause of action because the complainant has failed to state the source of his information and the grounds for his belief and, further, that the complaint is not verified.

2. That the said act, known as the "Fair Sales act," is unconstitutional and should be so declared.

In the opinion of the court, the defendant's second contention, that the act is unconstitutional, is correct. It is unnecessary, therefore, to discuss the first ground.

I find that nowhere in the constitution of New Jersey nor in any statute, is there any provision denying or prohibiting to any court the right to rule upon the question of the constitutionality of an act in a proper case. As to the right of the District Court to pass upon the constitutionality of a statute, I know of or find no such restriction. If the question of constitutionality is directly drawn into a question, and that question must be decided to determine the matter, "a proper case" is presented and the duty to pass upon the constitutionality cannot be avoided.

In *Lent* v. *Tillson*, 140 *U. S.* (at *p.* 329), it is said:

"The judge or judges of that court [referring to a county court of a state] were obliged, by their oath of office, and in fidelity to the supreme law of the land, to refuse to give effect to any statute that was repugnant to that law; anything in the statute or the constitution of the state to the contrary notwithstanding."

In 2 *American Jurisprudence* 714, the following rule is stated:

"When it is clear that a statute transgresses the authority vested in the legislature by the constitution, it is the duty of the courts to declare the act unconstitutional because they cannot shrink from it without violating their oath of office."

The legislative intention that District Courts should, in "proper cases," rule upon the constitutionality of statutes, is distinctly expressed in *Rev. Stat.* (1937) 2:8-10, as to the oath of District Court judges:

"I, (A. B.) do solemnly promise and swear that I will administer justice without respect to persons, and faithfully and impartially perform all the duties incumbent upon me as judge of ——— District Court of the City of ——— (or of the ——— Judicial District of the County of ———) according to the best of my ability and understanding, agreeably to the constitution and the laws of the State of New Jersey, so help me God; and I do sincerely profess and swear that I do and will bear true faith and allegiance to the government established in this state, under the authority of the people, so help me God."

Under our system of government, it would appear that every American court has the right to determine the constitutionality unless such right has been expressly limited or removed. All constitutional courts have such power which cannot be taken away by legislation. All other courts are vested with the power, unless it is expressly denied.

In the case of *Pollock* v. *Farmer's Loan and Trust Co.*, 157 *U. S.* 429, Mr. Chief Justice Fuller, speaking for the United States Supreme Court, states (at *p.* 554):

"Necessarily the power to declare a law unconstitutional is always exercised with reluctance, but the duty to do so in a proper case cannot be declined and must be discharged in accordance with a deliberate judgment of the tribunal in which the validity of the enactment is directly drawn in question."

The defendant admittedly advertised loss leaders to attract customers to its store to sell, in addition to the loss leaders, other merchandise priced at a normal profit ratio. There certainly is no pernicious fraud in that practice as long as

the goods are advertised and sold at the prices stated. The fraud appears when customers order the goods advertised and are told that the line has been sold out and substitutes are offered at higher prices.

On argument there was, and in counsel's brief there is a long discussion as to whether the "Fair Sales act," in prohibiting the selling of an article below cost, is contrary to public policy. Plaintiff relies upon cases in the Supreme Court of the United States, and state reports, as follows: *Lynch* v. *City of Long Branch*, 167 *Atl. Rep.* 664; *In re Merrill*, 88 *N. J. Eq.* 261; 102 *Atl. Rep.* 400; *Nebbia* v. *New York*, 291 *U. S.* 502; *State, ex rel. Doyle* v. *Newark*, 34 *N. J. L.* 236; *Miles Medical Co.* v. *Park*, 220 *U. S.* 372; *Park Sons Co.* v. *Hartman*, 153 *Fed. Rep.* 24; *Old Dearborn Dist.* v. *Seagram Distillers*, 57 *Sup. Ct. Rep.* 139; *Johnson & Johnson* v. *Weisbard*, 191 *Atl. Rep.* 873; 41 *C. J.* 114, § 77; *Boston Store* v. *American Gramophone*, 246 *U. S.* 8; *Ingersoll* v. *Hahne*, 88 *N. J. Eq.* 222; *Tyson* v. *Banton*, 273 *U. S.* 418; 58 *A. L. R.* 1236.

I think that, at least, it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear; as for example, the milk industry. I believe we cannot too greatly exaggerate the value and importance to the public of fixing a fair price in competition.

Fixing the price on all goods is a very different thing from fixing the price on one kind of article. The one means destruction of all competition and of all incentive to increase excellence of the product; the other means heightened competition and intensified incentive to increase quality.

Citing *Wilentz* v. *Crown Laundry Service, Inc.*, 116 *N. J. Eq.* 40; 172 *Atl. Rep.* 332:

"No common law right has been more firmly established or treasured than the right of the individual to sell his goods or his services at whatever price he and the purchaser might agree upon."

Although the "Fair Sales act" might help a few selfish interests, it would be detrimental to the public as a whole.

The buying public would be forced to purchase articles at higher prices, increasing the cost of living. The legislature fixing prices must be directed to articles which are affected with a public interest and not take away the common law rights of the people.

In *Tinsman* v. *Belvidere Delaware Railroad Co., 26 N. J. L.* 148, the court stated that:

"Statutes in derogation of common law rights are to be strictly construed and we are not to infer that legislature intended to alter the common law practice any further than expressed, or any more than the case absolutely requires."

In the instant case, not only is the ground for interference by the legislature not "very clear," but no ground for any interference whatever has been shown, which in any manner whatsoever justifies the deprivations or limitation of the unquestioned rights of individuals. The *"Fair Sales act,"* under the American concepts of government and economics, is a deprivation of clearly defined property rights without due process of law. It is not at all denied that there are many instances in which states do have the right to fix prices, or to state even more accurately, to limit or restrict the clear and unequivocal common law right of the individual to fix his own prices in free competition. The first and underlying question to settle is whether the defendant can be deprived of his common law right or even his constitutional right to fix his own prices. That this is so self evident from the very words of article IX, of the Federal Constitution, which states unequivocally:

"Rights reserved—the enumeration in the constitution of certain rights, shall not be construed to deny or disparage other rights retained by the people."

The United States Supreme Court, in the case of *Tyson* v. *Banton,* 273 *U. S.* 418 (at *p.* 429), states:

"In the endeavor to reach a correct conclusion in respect to this inquiry, it will be helpful, by way of preface, to state certain pertinent considerations. The first of these is that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property

itself. Case of the *State Freight Tax*, 15 *Wall.* 232, 278, and, as such, within the protection of the due process of law clauses of the fifth and fourteenth amendments. See *City of Carrolton* v. *Bazzette*, 159 *Ill.* 284, 294."

As previously stated, that it is not denied that there are instances in which the states can limit or restrict the right of the individual to fix his own prices. Those instances, as it is readily admitted by the plaintiff here, fall within a very narrow classification. In words so strong and clear that reasonable persons cannot possibly differ as to their meaning, the Supreme Court of the United States has given the formula.

In *Williams* v. *Standard Oil Co.*, 278 *U. S.* 235, the court said (at *p.* 239) :

"It is settled by recent decisions of this court that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' *Wolff Co.* v. *Industrial Court*, 262 *U. S.* 522; *Tyson* v. *Banton, supra; Fairmont Co.* v. *Minnesota*, 274 *U. S.* 1; *Ribnik* v. *McBride*, 277 *Id.* 350. Nothing is gained by reiterating the statement that the phrase is indefinite. By repeated decisions of this court, beginning with *Munn* v. *Illinois*, 94 *Id.* 113, that phrase, however it may be characterized, has become the established test by which the legislative power to fix prices of commodities, use of property, or services, must be measured."

The question, "when is a business 'affected with a public interest,' " is answered in the same case at the bottoms of pages 239 and 240, which state:

"As applied in particular instances, its meaning may be considered both from an affirmative and negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusions that it has been devoted to a public use and its use thereby in effect granted to the public. *Tyson & Brother* v. *Banton, supra* (at *p.* 434). Negatively, it does not mean that a business

is affected with a public interest merely because it is large or because the public is warranted in having a feeling of concern in respect of its maintenance. *Id.,* 430. The meaning and application of the phrase are examined at length in the Tyson case, and we see no reason for restating what is there said."

It now becomes important in this case to inquire, "What business, if any, has been declared by the *Fair Sales act* to be 'affected with the public interest.'" The "Fair Sales act" declares not one single business enterprise to be so affected, and yet imposes restrictions upon all business. Under no sweeping conception of government or economics has there been such a sweeping deprivation of long cherished rights constitutionally reserved to the individuals, themselves, been justified under the law of the land. Even if the legislature had so declared in this act that any business was so affected with a public interest as to justify the deprivation and right of the individual to fix his own prices that declaration would still be one for judicial decision. For, in the Tyson case, the court said (at *p.* 431):

"And, finally, the mere declaration by the legislature that a particular kind of property or business is affected with a public interest is not conclusive upon the question of the validity of the regulation. The matter is one which is always open to judicial inquiry. *Wolff Co.* v. *Industrial Court,* 263 *U. S.* 522, 536."

The plaintiff contends that this is not a price fixing bill, but is a bill only to put a floor under prices, and cites the 1935 statutes of California, page 1546; *Deering, Codes, Laws and Constitutional Amendments,* 1935, *Supp.* 2063, *Act* 8781, and in support thereof *Miller* v. *Board of Public Works,* 195 *Cal.* 477, 484; 234, *pp.* 381, 383; 38 *A. L. R.* 1479. *Wholesale Tobacco Dealers Association* v. *National Candy and T. Co.,* 82 *Pac. Rep.* (*2d*) 3. These cases cited are based upon the statute of California which is substantially different from our own; as well as chapter 69 of the acts of 1937 of Tennessee, citing *Rust* v. *Griggs,* 113 *S. W. Rep.* (*2d*) 733 (*Tenn.*).

I, therefore, feel that the right of the individual to fix his own prices cannot be infringed or denied, except in certain cases falling in well defined limits, none of which are present here. Citing *Robert H. Ingersoll & Bro.* v. *Hahne & Co.*, 88 *N. J. Eq.* 222; 101 *Atl. Rep.* 1030; *affirmed*, 89 *N. J. Eq.* 332; 108 *Atl. Rep.* 128; *Wilentz* v. *Crown Laundry*, 116 *N. J. Eq.* 40; 172 *Atl. Rep.* 331; *Tyson* v. *Banton, supra; Ribnik* v. *McBride*, 277 *U. S.* 350; *Williams* v. *Standard Oil, supra; Near* v. *Minnesota*, 283 *Id.* 697.

It is contended on the part of the plaintiff that the decision of the United States Supreme Court in the Nebbia case has altered the well established rules heretofore extended. Certainly all of the cases cited above, and many others too numerous to mention, have struck down as unconstitutional all price fixing statutes, except where the business subject to the operation of each such law was "affected with a public interest." Therefore, the question is, "has the Nebbia case altered that firmly entrenched rule?" A study of the case will disclose that it has not. See the reported case of *Nebbia* v. *New York*, 291 *U. S.* 502, decided by the United States Supreme Court two days after the date on which the emergency statute there in question was to have expired by its own limitation.

The argument before the highest court disclosed that "the legislation is of a temporary nature" (at *p.* 511) and that "the temporary and emergent character of the legislation being accepted, it is well within the police power." A reading of the case discloses the emergency, and the emergent character of the act in all its details. Of greater importance, however, are two points: (1) The act was one relating and limited, to one industry; milk. Nothing else was affected. (2) The milk industry was one very "vitally affected with the public interest." Those two points in and by themselves bring the Nebbia case squarely within the rules laid down and cases already cited, and by the same token, leave the "Fair Sales act" under the same infirmities described in those cases. The defendant, stating excerpts from the Nebbia decision, discloses this to be clearly so. The court said (at *p.* 515):

"The question for decision is whether the Federal Constitution prohibits a state from so fixing the selling price of milk."

And (at *p.* 521): "Save the conduct of railroads, no business has been so thoroughly regimented and regulated by the State of New York as the milk industry."

And further (at *p.* 530): "The milk industry in New York has been the subject of long standing regulation in public industry."

And (at the bottom of *p.* 530): "The industry disclosed destructive and demoralizing competitive conditions and unfair trade practices which resulted in retail price cutting and reduced the income of the farmer below the cost of production." (No such inquiry or disclosure is shown in the instant case.)

And (at the bottom of *p.* 536): "The phrase 'affected with a public interest' in the nature of things, means no more than an industry for an adequate reason, is subject to control for the public good." These words referring to only one industry, and not to all industries.

From examining the above cases, it is apparent that (1) The act was a temporary emergency measure to cope with a hopelessly chaotic condition in one industry alone; (2) that the act referred to and dealt with that one industry alone; and (3) that the one industry is as much if, indeed, not more than any other, vitally "affected with the public interest."

After careful consideration of the brief filed in this matter, and examining the law pertinent to the question, I am of the opinion that the act known as the "Fair Sales act" is unconstitutional and I will, therefore, sustain the motion to dismiss the complaint filed in this case.