The People of the State of New York ex rel. Joseph Tipaldo,
Relator, *v.* Frederick L. Morehead, as the Warden of the
City Prison in the Borough of Brooklyn, Respondent.

Supreme Court, Kings County, June 26, 1935.

*Goldberg & Levitt*, for the relator.

*John J. Bennett, Jr., Attorney-General* [by *Henry Epstein, Solicitor General*, and *John F. X. McGohey, Benjamin Heffner* and *John C. Crary, Assistant Attorneys-General*], for the People of the State of New York.

May, J.   This is a proceeding by habeas corpus instituted by the relator to test the validity of article 19, added to the Labor Law by chapter 584 of the Laws of 1933 and entitled " Minimum Fair Wage Standards for Women and Minors." The relator is imprisoned under an indictment which charges in substance that he, as manager of a laundry in Brooklyn, paid adult women

employees a lesser sum than the minimum wage fixed for that class of employees by the Industrial Commissioner pursuant to the provisions of the act. He asserts that the statute contravenes the Fourteenth Amendment of the Federal Constitution and article 1, section 6, of the Constitution of the State of New York, in that it operates to deprive him of liberty and property without due process of law, and also operates to compel him to be a witness against himself in a criminal case.

Section 550, the first section of the new article, recites the factual situation which, in the opinion of the Legislature, justified the enactment as a valid exercise of the police power. These recitals are in substance as follows: That the employment of women and minors in trade and industry in this State at wages unreasonably low and not fairly commensurate with the value of the services rendered is a matter of " grave and vital public concern;" that many women and minors so employed are not as a class upon a level of equality in bargaining with their employers in regard to " minimum fair wage standards," and " freedom of contract " as applied to their relations with their employers is illusory; that since a very large percentage of such workers are obliged to support themselves and others from their weekly wages, they are by reason of their " necessitous circumstances " forced to accept whatever wages are offered them; that judged by any reasonable standard, wages in many cases are fixed by " chance and caprice " and bear no relation to the fair value of the services rendered.

The remaining portion of the section reads as follows: " Women and minors employed for gain are peculiarly subject to the over-reaching of inefficient, harsh or ignorant employers and under unregulated competition where no adequate machinery exists for the effective regulation and maintenance of minimum fair wage standards, the standards such as exist tend to be set by the least conscionable employers. In the absence of any effective minimum fair wage rates for women and minors, the constant lowering of wages by unscrupulous employers constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers and threatens the stability of industry. The evils of oppressive, unreasonable and unfair wages as they affect women and minors employed in the state of New York are such as to render imperative the exercise of the police power of the state for the protection of industry and of the women and minors employed therein and of the public interest of the community at large in their health and well-being and in the prevention of the deterioration of the race. In the considered judgment of the legislature this article is constitutional."

The statute (§ 551) defines "an oppressive and unreasonable wage" and "a fair wage" and section 552 declares it to be against public policy to employ any woman or minor in an occupation in this State at an oppressive and unreasonable wage as defined by the foregoing provisions. By other provisions there is set up a comprehensive scheme with adequate machinery to carry into effect the purpose of the act.

The underlying thought of relator's contention appears to be that the right of freedom of contract emanates from the Fifth Amendment to the United States Constitution which provides that no person shall be deprived of life, liberty or property without due process of law; and consequently that the minimum wage law here under consideration, in that it deprives an adult woman in full possession of her normal faculties of the right freely to contract with reference to her services, violates the similar inhibition upon States found in the due process clause of the Fourteenth Amendment.

In support of his contention relator relies principally upon the case of *Adkins* v. *Children's Hospital* (261 U. S. 525). In that case the court decreed the unconstitutionality of an act fixing the minimum wages for women and children in the District of Columbia. The court there asserted that it was no longer open to question that the right to contract with reference to one's affairs is a part of the liberty of the individual which is protected by the due process clause of the Fifth Amendment; that included in the right of personal liberty and private property is the right to contract for the acquisition of property, and that chief among such contracts is that of personal employment whereby labor and other services are exchanged for money or other forms of property. After reference to decisions sustaining the validity of statutes relating to businesses "impressed with a public interest" and to decisions relating to statutes limiting the hours of labor in certain industries, including the case of *Muller* v. *Oregon* (208 U. S. 412), the court wrote as follows: "But the ancient inequality of the sexes, otherwise than physical, as suggested in the *Muller Case* (p. 421) has continued 'with diminishing intensity.' In view of the great — not to say revolutionary — changes which have taken place since that utterance, in the contractual, political and civil status of women, culminating in the Nineteenth Amendment, it is not unreasonable to say that these differences have now come almost, if not quite, to the vanishing point. In this aspect of the matter, while the physical differences must be recognized in appropriate cases, and legislation fixing hours or conditions of work may properly take them into account, we cannot accept the doctrine that women of mature age, *sui juris*, require or may be subjected to restrictions

upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances. To do so would be to ignore all the implications to be drawn from the present day trend of legislation, as well as that of common thought and usage, by which woman is accorded emancipation from the old doctrine that she must be given special protection or be subjected to special restraint in her contractual and civil relationships."

Notwithstanding the force and cogency of this reasoning, this court is not prepared to assert that the *Adkins* case is an authority which impellingly necessitates an adjudication of the invalidity of the statute here involved. It is of special significance that in the *Adkins* case, with reference to the conception of liberty as involved in the words " right of contract," the court wrote: " 'An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary, *unless it be supportable as a reasonable exercise of the police power of the State.*' " (Italics ours.)

And again with reference to freedom of contract the court wrote: " There is, of course, no such thing as absolute freedom of contract. It is subject to a great variety of restraints. But freedom of contract is, nevertheless, the general rule and restraint the exception; *and the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances.*" (Italics ours.)

Here is a distinct and unequivocal pronouncement that a reasonable exercise of the police power may work an interference with liberty of contract that is not necessarily to be deemed arbitrary, and that an abridgement of that right may be justified by " exceptional circumstances."

The primary question here involved is whether, within the purview of the principles thus enunciated, the interference with the right to contract effected by the minimum wage law may be justified as an exercise of the police power, reasonable because justified by existing conditions, or to state it otherwise, whether the abridgement of freedom of contract may be sanctioned " by the existence of exceptional circumstances " within the rule above stated.

An attempt to exhaustively review the substance of oral and written characterizations of the effect of the world-wide depression would serve no useful purpose. The court may take judicial notice that almost without warning it came upon mankind with an unforeseen and irresistible onrush that bound and fettered the world in its devastating grip. Business collapsed, our conceptions of economic and social securities were shattered, peace of mind was transformed into dread apprehension, contentment into unrest, comfort gave way to hardship and sufficiency to privation. As a result of

this universal catastrophe, thousands of women reared to a life of ease, maintained in comfortable surroundings, inexperienced with the hardship of poverty, with no occupational training and with no business experience, suddenly found themselves engulfed in the whirlpool of industrial strife, forced there by a calamity of hitherto unknown magnitude, compelled to there engage in a merciless and to them unfamiliar competition.

Do the dictates of reason and the common experience of mankind impel the conclusion that under these conditions these women are on a parity with men in their ability to distinguish between legitimate and unscrupulous business practices, between the honest and dishonest employer, between fair dealing and chicanery, between " an oppressive and unreasonable wage " and " a fair wage " as defined in the act? The Legislature has answered the inquiry in the negative as evidenced by the last sentence in section 550 which reads: " In the considered judgment of the legislature this article is constitutional."

This declaration, unusual in a statute, indicates a legislative familiarity with the decisions of the higher courts with reference to legislation of this general character and amounts to a pronouncement that in the Legislature's opinion, the act, in so far as it interferes with liberty of contract, is justified as a reasonable exercise of the police power by the existence of these " exceptional circumstances."

The act evidences a humane legislative intent to ameliorate human distress by affording a measure of security to women who, by reason of unprecedented adverse conditions existing at the time, were unable to adequately protect themselves in an industrial life in which, as compared with men, they were at a disadvantage. Thus, its ultimate purpose was to protect women from unscrupulous employers through the medium of a compulsory wage reasonably commensurate with the services rendered, and also to protect industry from evils which are frequently followed by unfair competition made possible by the exploitation of a designated class of employees. It would seem that public welfare is enhanced by legislation based upon humane considerations of this character, legislation justified as an exercise of the police power. The *Adkins* case was decided at the time of an era of comparative prosperity. This court is not prepared to assert that the same conclusion would have been reached had economic and industrial conditions then been as they were at the time of the enactment here involved.

The police power is inherently vested in the Legislature. It was never surrendered by the several States and consequently its free exercise is not necessarily impeded by the Fourteenth Amend-

ment to the Federal Constitution. Through the exercise of this power " the state may regulate the relative rights and duties of all persons within its jurisdiction, so as to guard the public safety, protect the public morals, secure the public health and promote the common good and welfare." (*People* v. *Byrne*, 99 Misc. 1; *Jacobson* v. *Massachusetts*, 197 U. S. 11, at p. 25; *People* v. *Adirondack Ry. Co.*, 160 N. Y. 225, at p. 236.)

In the last case cited, in speaking of the power of taxation, the police power and the power of eminent domain, the court said that these powers " underlie the Constitution and rest upon necessity, because there can be no effective government without them. They are not conferred by the Constitution, but exist because the state exists, and they are essential to its existence. They are not rights reserved, but rights inherent in the state as sovereign. While they may be limited and regulated by the Constitution, they exist independently of it as a necessary attribute of sovereignty. They belong to the state because it is sovereign, and they are a necessity of government. The state cannot surrender them, because it cannot surrender a sovereign power. It cannot be a state without them. They are as enduring and indestructible as the state itself."

Other well-established legal principles are pertinent to the present inquiry.

Thus it is held that to warrant a court in declaring an act unconstitutional, the conflict between the statute and the Constitution must be " plain and unmistakable " and that " every presumption is in favor of the validity of a legislative enactment." (*People* v. *Ryan*, 230 App. Div. 252, at p. 254; *City of Buffalo* v. *Hawks*, 226 id. 480, at p. 485; affd., 251 N. Y. 588; *People* v. *Carter & Rice*, 135 id. 473, at p. 484; *Gardner* v. *Ginther*, 232 App. Div. 296, at p. 298; affd., 257 N. Y. 578.)

And if a reasonable doubt exists as to its validity the act should be upheld. Every reasonable doubt must be resolved in favor of its validity. (*City of Buffalo* v. *Hawks, supra; Gardner* v. *Ginther, supra.*)

Moreover, the acts of a Legislature are presumed to be " within its constitutional authority unless the contrary clearly appears." (*Schieffelin* v. *Goldsmith*, 253 N. Y. 243, at p. 249; *Matter of McAneny* v. *Board of Estimate, etc.*, 232 id. 377, at p. 389; *People ex rel. Cotte* v. *Gilbert*, 226 id. 103, at p. 106.)

It is also the rule that one who asserts the invalidity of a statute or a classification must prove his contention. (*People* v. *Byrne, supra; Borden's Co.* v. *Baldwin*, 293 U. S. 194.)

It has also been stated that "As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute." (*O'Gorman & Young* v. *Hartford Insurance Company*, 282 U. S. 251, at pp. 257, 258; *People* v. *Katz*, 140 Misc. 46, at p. 47.)

No proof of facts is here adduced in contradiction of the factual situation declared to exist by the Legislature. These facts so deemed to exist form the basis for the conclusion that this legislation is not unconstitutional as exceeding the permissible bounds of the exercise of the police power, and it would not appear that it may be so decreed as matter of law.

Although the question is not here raised, it may not be inappropriate to say that it does not appear that the minimum wage law evidences an unwarranted delegation of legislative power to an administrative board or body. The act does not authorize the exercise of unlimited discretion in an undefined field. On the contrary, a standard is prescribed. That standard is found in the definition of " a fair wage," which limits the authorized discretion of the administrative body within the confines indicated by the definition. In this respect the act is not defective for the reasons advanced in the recent decision of the United States Supreme Court in the *Schechter Case* (295 U. S. 495).

Without doubt, this legislation was prompted by humane and beneficient considerations. The intent was to protect a designated class from injustice and exploitation, thereby also promoting the public welfare by diminishing one cause of unfair competition with its resulting industrial chaos.

The writ is accordingly dismissed.