**KENT STORES OF NEW JERSEY et al. v. WILENTZ, Atty. Gen. of New Jersey, et al.**

**FEDERAL CLEANERS & DYERS, Inc., et al. v. SAME.**

District Court, D. New Jersey.

March 11, 1936.

Minturn & Weinberger, Harry H. Weinberger, and Hyman Halpern, all of Newark, N. J., and S. Frederick Placer, of New York City, for complainants.

David T. Wilentz, Atty. Gen., of New Jersey and Hervey S. Moore, of Trenton,

N. J. (Isadore H. Colton, of Newark, N. J., of counsel), for defendants.

Before DAVIS, Circuit Judge, and CLARK and FORMAN, District Judges.

CLARK, District Judge.

The Legislature of New Jersey by chapter 281 of the Laws of 1935 (N.J.St. Annual 1935, § *225—17 et seq.) undertook the extensive regulation of the cleaning and dyeing trade. This industry seems to have received considerable legislative and judicial attention. A code of fair competition under the late National Recovery Act, 15 U.S.C.A. § 701 et seq., was approved, and therefore promulgated by the President on November 8, 1933, Bulletin No. 101, Registry No. 1714–22, N. R. A. Article IV of this Code provided a specific schedule of minimum wages and Article VI set up a code authority with power inter alia "to establish and prescribe fair and reasonable wholesale and retail prices." It was sustained on March 31, 1934, by the District Court of the Southern District of New York in the case of United States v. Spotless Dollar Cleaners, Inc., 6 F.Supp. 725, 727. This case revealed the obverse of the current situation, inasmuch as a New York Corporation was delivering clothes to a processing plant of a New Jersey corporation in Edgewater, N. J. Judge Knox, the senior judge of that District, picturesquely portrayed the conditions in the industry as they appeared to him:

"So baneful, says the government, has been the sum total of conditions affecting the cleaning and dyeing business, that it has been brought to the brink of ruin, and has subjected the more hardy estab-

lishments within the industry to the terrorism of the racketeer and trade ruffian. The situation thus created in particular localities has been aggravated by existing facilities of commerce and communication between the states, especially where large cities are to be found near state boundary lines. When such is the case, the problems and difficulties prevailing in the industry in one large city spread as does a miasmic mist over the territory of the adjacent state and its nearby city. Hence a price war which breaks out in one locality soon rages fiercely elsewhere.

"The industry is further represented as being possessed of peculiar frailties. One reason assigned for this is that profits in the industry are dependent primarily upon a 'volume' business, and that 'volume' flows to the merchants who unfairly cut prices to the point of profit banishment. In this way, merchants who are either unwilling or unable to meet the nonprofit prices of competition are forced to retire from the field in which they once prospered. When fatalities of this nature have become sufficiently great, the man who has wrought disaster to his vanquished opponents views his accomplishment with satisfaction, and makes haste to raise his prices. Meanwhile, the price of labor in the industry has been forced from living standards to those of bare existence; bankruptcies have occurred; the quality of service rendered the public has been impaired; and, finally, unemployed workers of the industry walk the streets. In addition, other results have come about." 6 F.Supp. 725, at pages 727, 728.

The appeal of this case was abandoned, prior to the decision in the Schechter Case (A. L. A. Schechter Poultry Corporation v. United States), 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, upon the filing of an executive order revoking price fixing.

Similar cleaning and dyeing cases are collected in a note in 82 Pennsylvania Law Review, 738. Similar statutes have been passed in Wisconsin (Code approved by the Governor, July 26, 1935, under the Wisconsin Recovery Act) chapter 182, P.L. Wisconsin, 1935; in Florida, P.L.Florida, 1935, c. 16979; and in Delaware, chapter 120, P.L.Delaware, 1935 (40 Del. Laws). The Wisconsin Code in article 4 (entitled Predatory Competition) forbids the "sale of the services of the indus-

try at less than the reasonable cost thereof to be determined by the state cleaning and dyeing code authority" and in article 7 prescribed minimum rates of pay for employees. Neither the Florida nor Delaware Acts deal with the workers. The former, by section 9, vests the Cleaning, Dyeing and Pressing Board with authority to fix a minimum scale of charges for the various services and the latter by rule 1 gives the Trade Board power to establish reasonable costs below which service should not be rendered.

The New Jersey Act (and cf. Code under the state or "little N. R. A." approved by the Governor, November 17, 1933), chapter 372, P.L.1933, as amended (N.J. St.Annual 1934, § *225—3 et seq.), is more comprehensive than those above cited. It grants complete powers for the regulation of the industry, including the prevention of seventeen unfair trade practices, the establishment of standards of sanitation and of course the authority to "prescribe fair and reasonable minimum wholesale and retail prices" (section 3, subdivision D, N.J.St.Annual 1935, § *225—19, subd. D), and "to establish minimum rates of pay, maximum hours of employment, and to prohibit the employment of child labor in the cleaning and dyeing trade of this State" (section 3, subdivision J, N.J.St. Annual 1935, § *225—19, subd. J).

Several cleaning and dyeing companies are unwilling to comply with the regulations of the state board appointed under the act. These regulations were promulgated after hearings extending from September 9 until October 3, 1935. The findings of fact and the conclusions of the board were published December 9, 1935, and are the major part of the record herein. They are distinctly reminiscent of the passage from Judge Knox's opinion which we have just quoted. These companies, as is their right, attack the enabling statute on constitutional grounds, and as is their necessity, invoke the convening of a three-judge court (cf. "A Case for Three Judges," Hutcheson, 47 H.L.Rev. 795).

The constitutional ground is the familiar one "due process," and we are thereby faced with what Mr. Justice Holmes once called the apologetics of the police power. There is no present advantage in speculating on the posture of our country's political economy in the absence of the accepted interpretation of the

famous clause. The history and logic of that interpretation is a never failing subject for treatment by the scholars of the law. A brilliant discussion is found in an article by the late Judge Hough in 32 Harvard Law Review, 218. He concludes it at page 233 by declaring that the action of judges thereunder is a "far higher exercise of judicial thought than," he says, "insurance or patent law; it is really a function of political criticism." At any rate we can agree that there is a great difference of function in passing on the definition of the police and the distribution of the other powers.

Before giving detailed consideration to the application of the due process clause to the minimum wage and price provisions of the statute, we take note of the legislative declaration of emergency (section 1, of the act [N.J.St.Annual 1934, § *225—3] and statement of legislative purpose). We are not, however, going to do any more than take note of it. This "emollient of emergency" as Professor Powell has called it (Commerce, Pensions, and Codes, II, 49 H.L.Rev. 193) has become standard legislative practice, since it received the desired accolade in the rent (or housing shortage) cases, Block v. Hirsh (1921) 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165; Marcus Brown Holding Co. v. Feldman (1921) 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877; Edgar A. Levy Leasing Co. v. Siegel (1922) 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595; and see Chasleton Corporation v. Sinclair (1924) 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (declaring that particular emergency at an end). It has been extended to moratory laws, Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481; Feller, Moratory Legislation: A Comparative Study (1933) 46 H.L.Rev. 1061, 1081–85; Mortgage Relief During the Depression, 47 H.L.Rev. 299; Constitutionality of Mortgage Relief Legislation, 47 H.L.Rev. 660; but rejected in A. L. A. Schechter Poultry Corporation v. United States, supra. The principal fact in support of an emergency theory found by the legislative board, is that "shortly after the stock market debacle of 1929 and with the advent of the depression the volume of business began to drop" (page 2 of the findings). This may be an argument for the Securities Exchange Act, 15 U.S.C.A. § 78a et seq. To attribute validity thereto would abrogate the due process clause altogether. Some think that the whole emergency doctrine is a recognition of the desirability of doing so.

Counsel for the complainant companies seemed so sure of the soundness of their objection to the price fixing features of the statute (a confidence, as we shall see, thoroughly justified) that they gave only cursory attention to the minimum wage provision. Perhaps it would be kinder to say that the policy of such law meets with their approval. The sad fact seems to be, however, that the law, at least as at present drafted, does not meet the constitutional standard established by the United States Supreme Court. It is not within the scope of this opinion to enlarge upon either the historical, social, or economic aspects of minimum wage legislation. There is a vast literature on the subject from which we have culled the following: Baker, Protective Labor Legislation (1925) 79–99; Burns, Wages and the State (1926); Development of Minimum Wage Laws in the United States, 1912 to 1927, U. S. Dept. of Labor Bulletin of the Women's Bureau No. 61 (1928); Armstrong, Insuring the Essentials (1932) 58–79; Crow, History of Legislative Control of Wages in Wisconsin (1932), 16 Marq.L.Rev. 188. An able statement of the argument pro appears in Principles of Labor Legislation, by Professors Commons and Andrews: "Minimum wage legislation, therefore, is designed to answer the demands of social policy in two ways. By setting a barrier below which wages may not fall, it lightens the pitiful poverty and prevents the degeneration in body and spirit of those forced to live on a wage too small to supply the necessaries of life. Competition among them no longer takes the form of offering to work for lower wages, but that of developing greater efficiency. At the same time, employers are forced to compete in efficiency of management, thus securing for society at large the many advantages of constantly improved methods of production. Minimum wage laws attempt neither to destroy competition nor to fix wages by law; they merely seek to set the lower limits to both in the interests of society as a whole." Pages 198, 199.

And see Oregon's Experience with Minimum Wage Legislation, by Morris, at p. 209: "While the increased labor cost

is probably an insignificant item, there will possibly be some concerns which will be driven out of business, marginal producers who cannot stand even a slight advance in costs. The term marginal producer is here almost a misnomer for they are rather sub-marginal producers who are managing to hang on by paying an unfairly low wage. This 'cutthroat' group will probably be eliminated by the minimum wage rulings unless they are induced to secure their net income by other means than low wages. These producers are similar to those in the well-known sweated trades and are of very questionable value to the community. If these industries are not fitted to survive while paying adequate wages it may be to the best interests of the state to have them eliminated."

The constitutional road of the legislation is well-known. It has been a rocky one. The high courts of all the states where the question was presented upheld the minimum wages. Stettler v. O'Hara (1914) 69 Or. 519, 139 P. 743, L.R.A. 1917C, 944, Ann.Cas.1916A, 217; Simpson v. O'Hara (1914) 70 Or. 261, 141 P. 158; State v. Crowe (1917) 130 Ark. 272, 197 S.W. 4, L.R.A.1918A, 567, Ann. Cas.1918D, 460; Holcombe v. Creamer (1918) 231 Mass. 99, 120 N.E. 354—a voluntary law; Williams v. Evans (1917) 139 Minn. 32, 165 N.W. 495, 166 N.W. 504, L.R.A.1918F, 542; Larsen v. Rice (1918) 100 Wash. 642, 171 P. 1037; Miller Telephone Co. v. Minimum Wage Commission (1920) 145 Minn. 262, 177 N.W. 341; Spokane Hotel Co. v. Younger (1920) 113 Wash. 359, 194 P. 595. The United States Supreme Court upheld the Oregon statute by a tie vote. Stettler v. O'Hara, 243 U.S. 629, 37 S.Ct. 475, 61 L.Ed. 937. It is interesting to reflect that the strategy of utilizing Mr. Brandeis' splendid talent in the lower court resulted in a disqualification which left the question open for a later adverse decision. That decision came in the case of Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238; The Judiciality of Minimum-Wage Legislation, 37 H.L.Rev. 545; and was followed by a memorandum opinion invalidating the Arizona statute. Murphy v. Sardell, 269 U.S. 530, 46 S.Ct. 22, 70 L.Ed. 396.

So the matter rested until very recently. As is known, the majority of the codes under the N. R. A. contained some form of minimum wage provision. Furthermore, the states of New Jersey and New York passed rather elaborate minimum wage laws for women and minors (chapter 152, P.L.N.J.1933, N.J.St.Annual 1933, § 107—137c (12) et seq.; chapter 584, P.L.N.Y.1933, amending the Labor Law by adding art. 19). These laws were called to the attention of the Governors of thirteen industrial states by President Roosevelt. The Labor Department advises us that the initiating petitions contemplated by the New Jersey Act have never been filed, and even if they had been, the appropriation, also contemplated we assume by the act, has never been made. For those reasons, the New Jersey act has not been in effect. The New York statute was upheld by the Supreme Court of that state. People ex rel. Tipaldo v. Morehead, Warden, 156 Misc. 522, 282 N.Y.S. 576. The learned justice writing the opinion expressed the thought that the high court would take a different view if and when the question were again presented: "The Adkins Case was decided at the time of an era of comparative prosperity. This court is not prepared to assert that the same conclusion would have been reached had economic and industrial conditions then been as they were at the time of the enactment here involved." 156 Misc. 522, 282 N.Y.S. 576, at page 581. (N. B.) Since these words were written, this case has been reversed by a four to three decision by the Court of Appeals in New York. 200 N.E. 799.

To the same effect are the sentiments of a writer in the Yale Law Journal: "Since the decision in Adkins v. Children's Hospital the facts of the case for a minimum wage law have undergone a compelling change and the effective demands for such legislation have assumed imperative proportions. According to a settled rule of constitutional law, therefore, that case is no longer binding precedent. In 1923 a minimum wage law was regarded as a humanitarian measure designed to prevent inordinate exploitation of labor. The issue was merely whether the state could impel employers to pay a fair living wage. Recent economic trends, however, have revealed a necessity for wage-fixing not appreciated at the time of the Adkins decision. It is now generally recognized that wage-cutting threatens the stability of indus-

try. Reduced wages mean decreased purchasing power, and decreased purchasing power paralyzes trade. Moreover, unlimited ability to slash costs constitutes a vicious weapon for unscrupulous competition. These factors make minimum wage legislation essential to any program for economic recovery." 42 Yale Law Journal, 1250–1252.

We are not in a position to join with these gentlemen in venturing a prediction. We do say this, however. If such a law is finally supported, it will not be of the type of the one now before us. It will probably be of a limited application (as for instance to women—some feel that this discrimination harms rather than helps and is therefore no argument for validity), and it will certainly prescribe either definite amounts or set up machinery for fixing a "living" or "fair" wage after the fashion of the minimum wage laws of other countries. Development of Minimum Wage Laws in the United States, 1912 to 1927, U. S. Dept. of Labor Bulletin of the Women's Bureau, No. 61 (1928); Minimum Wage Legislation in Various Countries, Rudolph Broda, U. S. Dept. of Labor Bulletin of the Bureau of Labor Statistics, No. 467, and cf. chap. 152, P.L.N.J.1933, above cited. No other rigid Constitution that we know of has a due process clause or its equivalent (Cf. Canada's Federal System, Lefroy; The Law of the Australian Constitution, Kerr; La Vie Juridique des Peuples, Levy-Ullman, and Mirkine-Guetzevitch; Judicial Review of Legislation in Canada, 28 H.L.Rev. 565 at 568; The Constitution Act of Australia, 30 H.L.Rev. 595 at 599), but see The State and Nation in a Federal System, 61 W.Va.Law Quarterly, No. 1, p. 1. Accordingly, the minimum wage laws of other countries have never been questioned on what might be, and indeed have been, called economic grounds. (The Canadian Law implementing International Labor Bureaus Standards is now before their high court as a violation of the powers granted to the federal government. See, Factum of the Attorney-General of Canada, 1936.) We mention, therefore, these foreign laws for their intrinsic wisdom only.

We may say that in the United States, as in any other federation, the problem is complicated by the question of the distribution of power as between the states and the nation. In an article on The Control of Industry in a Federal System, the learned author complains of the Australian minimum wage legislation in this language: "Nothing would serve better than this clause to exhibit the confusion of thought and purposes which seemingly accompanies the working of a federation." 41 W.Va.Law Quarterly 206. And a writer in the Wisconsin Law Review seems to have the same idea: "No state can fix minimum wages, outlaw the company union, reduce the working day, set up a system of unemployment insurance, or even finally prohibit the labor of children, without facing the strong probability that its action will reduce the share of its producers not only of the national market but even of its own. The hopeful theory that each state furnishes a laboratory, for local experiments in the economic field is strictly limited" (volume 10, p. 392). And its practical effect is discussed in Oregon's Experience, by Morris, above cited, at page 206: "Oregon employers thus have no cause for complaint, but this does not change the fact that closer co-operation is needed between the states. It is entirely possible for the conditions of interstate competition to work a hardship upon some employers and for the consequences to be such as to turn the employers' sentiment away from the law and hence to undermine its foundation." And see Minimum Wage Legislation in Various Countries by Broda, above cited.

We come now to the principal (and rather vexing question) of the case. Is the legislative fixing of minimum prices in the industry at bar in violation of the due process clause? We interpret the decisions of the Supreme Court in the affirmative. It is neither within our function nor our capacity to discuss the economic or social wisdom or unwisdom of either voluntary or compulsory price fixing. We might observe that as a forgotten factor in the answer, we have the problem of when incentive or its lack leads to greed ("narrowing lust for gold," Tennyson) on the one hand and to idleness and malingering on the other. It is a problem whose purely psychological aspect is also generally forgotten. At any rate, the disagreements between the suppliers and the demanders, the economists and the popular law-making bodies have continued ever since the named types emerged. (The Public Control of Business, Keezer and May; State Control of Trade and Commerce, Stickney; State Regulation of Prices in Aus-

tralia, Wilkinson; Price Fixing in New Zealand, Sutch; Money and Prices, Laughlin; Masquerade of Monopoly, Fetter and cf. "Does Price Fixing Destroy Liberty?" pamphlet, by George H. Earle, Jr., now governor of Pennsylvania.)

As the a fortiori theory of price fixing is the economic health of the economic body politic, it is incorrect to say that one form, i. e., maximum, is in the interest of the consumer and the other, i. e., minimum, is in the interest of the producer-distributor. Nevertheless, the less subtle and more widespread effect of high prices, combined with the economy of scarcity resulted in action by the law givers many centuries before their attention was given to the economy of abundance and law prices. We are familiar with the early failures of the Emperors Diocletian and Julian, the French Laws of the Maximum, and the early British and Colonial Enactments, Wilkinson, above cited pages 98–117; 240–243; and Stickney, above cited. During our own Revolution eight of the thirteen states passed laws fixing the prices of almost every commodity on the market (State Regulation of Prices Under the Fourteenth Amendment, 33 H.L.Rev. 838; Stickney, above cited). A similar situation seems to have existed in 'the Spanish American countries, and we find some of the legislation in an article in 25 Michigan Law Review wherein the author sets forth in critical fashion his views on its practical effect:

"That the human family cannot be legislated into a set mold of behavior and that the economic laws which underlie trade and intercourse cannot be enacted out of existence would seem to be self-evident. Yet, in the face of this, laws impossible of enforcement, seeking to realize some group's idea of the millennium by a process of legal bludgeoning, or to create an economic condition by fiat, continue to find their way into the statute books.

"Sporadic attempts to fix price levels in certain commodities and well-intentioned efforts to tinker with prices and profits in modern times evidence a dangerous tendency toward the revival of the old fallacy of price-fixing by law. Numerous examples of experiment and failure in this type of legislation in the past might be cited, but the writer prefers to illustrate the futility of these endeavors by the hitherto unutilized story of the first

great American trial of price-fixing legislation.

"Mexico or, more exactly, New Spain, was the scene of these pioneer New World laws to control prices." Page 15.

\* \* \* \* \* \*

"The conclusion must be that legislation to fix prices in early Mexico failed to do so, and that the lowering of prices would have come about without this extreme regulation and that under normal conditions prices would perhaps have dropped sooner and to a greater extent. Official organization to prevent profits also would seem to have provoked an unpleasant lowering of merchant morality with respect to honesty in business." Page 23.

So during the Great War the practice again became very general. Great Britain appears to find it unsatisfactory, for we have their Royal Commission on Sugar reporting in 1921 as follows: "Our experience shows that State control of trade is not desirable. For successful trading, constant vigilance, quickness of decision and secrecy are wanted, which it is difficult to secure in a public department."

In the United States, it was embodied in the Lever Act (40 Stat. at Large, c. 53, p. 276). Under this act, the power to fix the price of coal even in time of war was questioned by the United States Supreme Court. Addy Co. v. United States, 264 U.S. 239, at page 245, 44 S.Ct. 300, 68 L.Ed. 658.

Our tide of post-war price fixing legislation began in Montana where a statute of that state giving a commissioner power to regulate the prices in all commodities was held violative of the Fourteenth Amendment. Holter Hardware Co. v. Boyle (D.C.) 263 F. 134; 33 H.L.Rev. 838. The appeal of this case was dismissed by stipulation. Boyle v. Holter Hardware Co., 257 U.S. 666, 42 S.Ct. 91, 66 L.Ed. 425. In the following Supreme Court cases statutes fixing, maximum prices were in litigation: German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A. 1915C, 1189; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327; Williams, Com'r, v. Standard Oil Co. of Louisiana, 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596; O'Gor-

man & Young, Inc., v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Borden's Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; Borden's Farm Products Co. v. Ten Eyck, Com'r, 56 S.Ct. 453, 80 L.Ed. ——, Feb. 10, 1936; Mayflower Farms, Inc., v. Ten Eyck, Com'r, 56 S.Ct. 457, 80 L.Ed. ——, Feb. 10, 1936. It is hardly necessary to recall the more indirect method of approach by way of antitrust legislation and its enforcement and interpretation. It affected this very industry. The dissolution of a combination to raise prices charged for cleaning, dyeing, and renovating clothes in the District of Columbia was upheld. Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204.·

So much for maximum prices. That competition is not always the life of trade seems to have been more recently realized. In the famous schoolmaster's case (Y.B. 11 Hen. IV 47; Y.B. 11 Hen. VI 19) the master of the Gloucester grammar school complained of a rival who dispensed learning at 28 d. less a quarter per infant: "But the judge said: There is no ground to maintain this action; since the plaintiff has no estate but a ministry for the time; and though another equally competent with the plaintiff comes to teach the children, this is a virtuous and charitable thing, and an ease to the people, for which he cannot be punished by our law." 15 H.L.Rev. 427 at 428. See, also, Snowden v. Noah, Hopk.Ch.(N.Y.) 347, 14 Am.Dec. 547; Pudsey Gas Co. v. Bradford, L.R. 15 Eq. 167; and Ricker v. Portland & R. F. Railway, 90 Me. 395, 38 A. 338.

One remembers C. J. Shaw's, of Massachusetts, equally famous suppositious case found in his opinion, Commonwealth v. Hunt, 4 Metc.(Mass.) 111, 134, 38 Am. Dec. 346. The Chief Justice said: "Suppose a new baker sets up against an old baker. Prices are reduced; the old baker is damaged; he therefore sues. No legal wrong is done; the same thing may be said of all competition in every branch of trade and industry; and yet it is through that competition that the best interests of trade and industry are promoted." 15 H.L.Rev. 430.

Gradually, however, the courts came to question the "ease to the people" af-

forded by certain forms of price cutting, for we find them taking cognizance of circumstances wherein they felt it to be objectionable (Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.(N.S.) 599, 131 Am.St.Rep. 446, 16 Ann.Cas. 807; Dunshee v. Standard Oil Co., 152 Iowa, 618, 132 N.W. 371, 36 L.R.A.(N.S.) 263; and see, Wyman, Competition and the Law, 15 H.L.Rev. 427; Beers, The Fifth and Fourteenth Amendments Still Protect the Right To Do Business in Cutting Prices or Selling Below Cost, Notre Dame Lawyer, Vol. 7, No. 4). So an authority on unfair competition writing in the Harvard Law Review (Rogers, Predatory Price Cutting as Unfair Trade, 27 H.L.Rev., 139) concludes that:

"Of late years the courts, in their efforts to circumvent the ingenuity of trade parasites, have begun to enjoin acts of unsportsmanlike dealing not involving the element of deception." Page 153.

"It would seem as if an early development of the law ought to be in the direction of putting a stop to predatory price cutting." Page 154.

And see an extended discussion in the introduction and Chapter 9 of Price Cutting and Price Maintenance by Seligman and Love. The legislatures, both of the state and nation, were soon in accord with the scholars and quickly translated that accord into statutory action.

The philosophy of such regulation has been frequently expressed. We quote from the present Chief Justice of the United States Supreme Court (Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825: "If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce. The interests of producers and consumers are interlinked. When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry." 288 U.S. 344, at page 372, 53 S.Ct. 471, 478, 77 L.Ed. 825.

And a British economist, Wilkinson's State Regulation of Prices in Australia, above cited, at pages 240 and 242, 243:

"For the state to step in and virtually do what a private individual combination is condemned for doing, viz.: raising prices or keeping them at a higher minimum than that determined by the Law of Supply and Demand, may seem contrary to modern ideas of legislation for the benefit of the majority, but it is frequently a very short-sighted policy to allow a producing industry to be ruined by a temporary market glut. This has been fully realized by Australian legislatures, and several interesting schemes have been initiated or proposed for maintaining prices at or above a fixed minimum. These schemes or proposals have been in the direction of:

"1. Fixing minimum prices by legislation.

"2. State marketing and distribution.

"3. State·purchase of production.

"4. Restricting external import trade in the particular commodity or a substitute for it."

"In the case of a 'trust,' 'combination' or 'association' having a monopoly, or having by some means control of all, or nearly all, the supplies of a commodity within the State, minimum prices can be maintained and arrangements can be made to regulate the placing of supplies on the market. Arrangements can also be made to store, dump, or otherwise dispose of any surplus of production above the market requirements at the fixed minimum price. If the producers are unorganised, however, this is obviously impossible. For any system of minimum price-fixing to operate equitably, all holders of supplies must sell in proportion to their stock, and the market must be fed just as it is capable of absorbing supplies. The corollary, therefore to the State fixing minimum prices is that it must also take control of supply and act as distributor, or, at any rate, organise the distribution."

And from a former Federal Trade Commissioner and distinguished citizen of New Jersey (Public Control in the Public Interest by Gaskill, published by Washington Bureau of Sales Management Magazine, 1931):

"And in the light of reason it is not difficult to conclude that while the public interest undoubtedly lies in the reduction price, that interest is not served by a search for the lowest possible price which can be quoted and sustained on a basis of credit. Public interest requires a limitation upon price reduction. If, for no other reason, that unless productive property is to be depleted to exhaustion, recovery to it must come in the form of higher prices whose extent is the degree of replacement made necessary by the losses, plus a margin for profit unnecessarily high because of its uncertainty. Or, in the alternative, recovery as a necessity commits industry to a losing contest for volume in the losses which attend overproduction.

"In other words, the public interest is quite as vitally concerned that prices do not go too low as that they do not go too high. For the reason that, as prices are kept from going too low, the pressure for abnormal profit, either in periods of excess demand or in its alternative, the unending struggle for volume is brought under control." At page 56.

Although that philosophy seems to have a different implication from that underlying the opposite ends of the pole, we do not find that the Supreme Court has given it any constitutional significance. So Mr. Justice Sutherland, speaking for the Court in Ribnik v. McBride, above cited, said: "Under the decisions of this court it is no longer fairly open to question that, at least in the absence of a grave emergency * * * the fixing of prices for food or clothing, of house rental or of wages to be paid, whether minimum or maximum, is beyond the legislative power." 277 U.S. 350, at page 357, 48 S.Ct. 545, 546, 72 L.Ed. 913, 56 A.L.R. 1327.

Apparently the touchstone does not lie then in the gamut of fixing. Where do we find it? In a phrase extracted from the context of an early chapter on admiralty law. In De Portibus Maris, 1 Hargrave, Tr., Sir Matthew Hale spoke of the regulation of certain enterprises "affected with a publick (the spelling is Sir Matthew's, not ours) interest." Ingenious counsel included the phrase in their brief in the first challenge to state regulation of business. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77. The history of the matter has been brilliantly exposed by Messrs. Hamilton and McAllister in 39 Yale Law Journal 1089 and 43 H.L.Rev. 759. Their conclusions have been re-

viewed and adopted in a recent book (The Public Control of Business, Keezer and May, above cited). Any further discussion by us would be inappropriate. We are only called upon to decide whether the particular mercantile activity of the case at bar is so affected.

We are not given a laboratory formula for Lord Hale's test. Obviously the words are not to be taken in their literal sense. The public is interested in all social manifestations, business or otherwise. They have, then, some technical meaning. That meaning seems to have varied with the times and with the judges. Mr. Chief Justice Taft described it as a "process of inclusion and exclusion" (Wolff Packing Co. v. Court of Industrial Relations of State of Kansas, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280)—a phrase often applied to the due process clause itself (The Judiciality of Minimum-Wage Legislation, Powell, above cited)—and Mr. Justice Roberts, as "not susceptible of definition" (Nebbia v. New York, supra). Mr. Justice Holmes seems, as usual, to have hit the nail on the head by calling it "little more than a fiction intended to beautify what is disagreeable to the sufferer" (Public Control of Business, above cited, at page 112). The author of the already quoted Public Control of Business summarizes the situation thus: "Those who have investigated the matter seem to be fairly well agreed that the precedents for the control over certain enterprises have come down from time immemorial. They also subscribe to the proposition that only enterprises which produce commodities or services of general importance to the community are to be classified as affected with a public interest. Here agreement ends. * * *" Page 100.

We may say that the type of business does not determine. So service industries have been included (German Alliance Ins. Co. v. Lewis, supra; O'Gorman & Young v. Hartford Fire Ins. Co., supra, insurance cases) and excluded (Ribnik v. McBride, supra, employment; Tyson & Bro. United Theatre Ticket Offices v. Banton, supra, theatre tickets). The production and sale of commodities have been excluded (Williams v. Standard Oil Co., supra, gasoline; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747, ice; Wolff Packing Co. v. Kansas, supra, meat packing) and included (Neb-

bia and Borden's Co. Cases, supra, State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116, milk). Cf. Constitutionality of Regulating Milk as a Public Utility, 18 Cornell Law Quarterly, p. 420; Legislative Regulation of New York Dairy Industry, 42 Yale Law Journal, p. 1259; 32 Michigan Law Review, p. 65; 34 Columbia Law Review, p. 425.

We can also say that the type of regulation is not controlling. Management regulation has been sustained (Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.(N.S.) 1062, Ann.Cas.1912A, 487); maximum price regulation has been sustained (Nebbia v. New York, supra); and condemned (Williams v. Standard Oil Co. and Wolff Packing Co. v. Kansas, supra). Minimum price regulation has been sustained (Nebbia v. New York, supra) and directly condemned by way of dictum (Ribnik v. McBride, supra), and indirectly under the Sherman Act (Atlantic Cleaners & Dyers v. United States, supra; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035).

The theory seems to be that either price cutting, gouging (the regrating, forestalling, and engrossing of the early English law) Monopoly at Common Law, section 2 of the Sherman Anti-Trust Act (15 U.S.C.A. § 2), 31 H.L.Rev. 246 (the price of a young capon shall not pass 3d.); Stickney, above cited, or mismanagement (Noble State Bank v. Haskell, supra) will cause the public to suffer. Can the state attempt to prevent or alleviate that suffering? The Supreme Court says yes, if the suffering relates to fire insurance (German Alliance Ins. Co. v. Lewis, supra; O'Gorman & Young v. Hartford Fire Ins. Co., supra); to banks (Noble Bank v. Haskell, supra); and to milk (Nebbia and Borden's Co. Cases, supra). It says no, if it relates to getting fresh meat (Wolff Packing Co. v. Kansas, supra, ice, New State Ice Co. v. Liebmann, supra; jobs (Ribnik v. McBride, supra); entertainment (Tyson & Bro. United Theatre Ticket Offices v. Banton, supra); or gasoline (Williams v. Standard Oil Co., supra).

█ An examination of the list answers our questions. The decided cases in the Supreme Court exempt from regulation some necessaries (ice, meat, jobs) and all luxuries (theater tickets, gasoline) and

stress for inclusion the likelihood of 'extreme perishability (query as to ice). The cleaning and dyeing industry, in our opinion, comes within not only one, but both of the Supreme Court's brackets, and should be excluded.

We do not mean to question the desirability of clean and renovated apparel, and we recognize that the luxury (luxus, Latin, excess) of one generation or even day is the necessity of the next. Nevertheless, we do not believe that necessity in clothing goes beyond conventional protection from the elements. Certainly not, if the necessities of transportation do not include the automobile. Furthermore, the element of extreme perishability is absent. We can clean our own clothes, at any time, and we can wait to have their color changed. Milk and banks (particularly in recent years) spoil; fire, like time and tide, waits for no man. So we conclude that the cleaning and dyeing industry is not a business affected with a public interest and is immune, therefore, from legislative price fixing. We may say it has been suggested that the milk control cases abandon the public interest test and substitute the even vaguer one of a "reasonable exertion of governmental authority" (48 H.L.Rev. 331). What we have just said about the industry in litigation demonstrates that the challenged regulation is not such "reasonable exertion." So holding, we find the act attempting such regulation unconstitutional and void.

We do not consider and we imagine the Legislature itself would not wish us to consider the price fixing provision separable in the constitutional sense. It seems to us part of a plan for stabilization of the industry, and being excised, the plan, some of whose separate features, i. e., unfair trade prevention, sanitary regulations, maximum hours, child labor, etc., are undoubtedly constitutional, must fail. In discussing the bituminous coal industry, a writer in 41 W.Va.Law Quarterly at page 231 said: "The industry has rightly felt that the socially desirable minimum wage, maximum hour, collective bargaining and similar provisions cannot be maintained without price stability." And see, also, National Industrial Recovery Act, New Concept of Unfair Competition, Some Legal Aspects of It, 47 H.L.Rev. 85 at 109; The NIRA in the Book and in Business, 47 H.L.Rev. 458 at 473. If it becomes necessary to adopt a new legislative plan, regard might very well be paid to the theory of predatory price cutting (sales below costs, etc.) both as a common-law tort and as a method of unfair competition restrainable either on general equitable principles or definable by statute. As a matter of fact, there seems to be a law already on the New Jersey books (chapter 210, Laws of 1913, as amended chapter 376, Laws of 1915, chapter 107, Laws of 1916 [Comp.St.Supp. N.J.1924, §§ *225—1, *225—2], and cf. chapter 372, Laws of 1933 [N.J.St.Annual 1934, § *225—3 et seq.]) for the purpose and see Fair Trade Legislation, 49 H.Law Rev. 811.

Injunction will issue.

N. B. Since the filing of this opinion the complainant companies have wisely, we think, agreed to withdraw their objection to the provisions of the statute which give authority to regulate unfair trade, sanitation, maximum hours and the labor of children. These provisions are accordingly withdrawn from the scope of the injunction.