

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN 11, TEXAS

GERALD C. MANN
XXXXXXXXXXXX
ATTORNEY GENERAL

Honorable Sidney Lathem
Secretary of State
Austin, Texas

Dear Sir:  Opinion No. 0-5196
Re: Constitutionality of H.B. 100,
48th. Legislature, Reg. Sess.,
regulating labor unions.

We acknowledge receipt of your letter of April 6, 1943, requesting an opinion on the validity under the State and Federal Constitutions of H.B. No. 100 relating to the regulation of labor unions in this State. This bill has recently been enacted into law and we take it that your inquiry is directed primarily to determining what your duties as Secretary of State are under this law.

The only provisions of the Act which involve your office or the exercise of duties by you are Sections 1,2,3,5, and 6. Section 1 declares the public policy of the State to be that labor unions "affect the public interest and are charged with a public use." Section 2 contains a definition of terms contained in the Act, including the term "labor union" which is defined as "every association, group, union, lodge, local, branch, or subordinate organization of any union of working men, incorporated or unincorporated, organized and existing for the purpose of protecting themselves, and improving their working conditions, wages or employment relationships in any manner, but shall not include associations or organizations not commonly regarded as labor unions." Section 3 provides for the filing of reports with the Secretary of State, containing certain enumerated information regarding the labor union and its organization. Section 5 requires that union organizers have an organizers' card which is to be issued by you as Secretary of State upon written application filed in compliance with the Act. Section 6 requires labor unions to file with you all working agreements containing a "check off" provision, whereby the employer is authorized to and agrees to deduct union dues and other collections from the workers' check or salary and turn such sums over to the labor union.

We will now consider Section 1 of the Act and in that connection the constitutional power of the Legislature to pass laws regulating labor unions. This is a relatively new field

of legislation.  The first major legislation on the subject
in this country was the National Labor Relations Act of 1935
(29 U.S.C.A. Sec. 151, et seq.) commonly called the Wagner
Act, the validity of which was upheld by the Supreme Court
of the United States in National Labor Relations Board v.
Jones & Laughlin Steel Corp. (1937) 301 U.S. 1, 81 L. Ed. 893,
57 S. Ct. 615, 108 A.L.R. 1352.

The Legislature of the State of Wisconsin passed a
Wisconsin Labor Relations Act modeled after the Federal Act
and the Wisconsin Act has been held constitutional.  Wisconsin
Labor Relations Board v. Rueping Leather Co. 228 Wis. 473,
279 N.W. 673.  In that case it was pointed out that the power
of the State to pass such legislation "is based upon the police
power" while the power of the Federal Government "to deal with
the same subject is grounded upon and limited by the commerce
clause."  The Wisconsin Supreme Court concludes that the Fed-
eral Labor Relations Act does not prohibit State legislation
on the same subject.  The Court said:

> "The State may, therefore, regulate labor
> relations in the interest of the peace, health, and
> order of the State, and the Federal Government may
> regulate this relationship to the extent that unregu-
> lated it tends to obstruct or burden interstate com-
> merce.  Obviously, a possibility of conflict between
> these powers exists only as to the portion of the
> field with which Congress has competency to deal.
> In the absence of a Federal statute either dealing
> with or preempting the field, the police power of the
> State has full operation, provided no undue or dis-
> criminatory burdens are put upon interstate commerce."
> 279 N.W. p. 676.

See, also, Allen-Bradley Local No. 1111, United Elec-
trical, Radio & Machine Workers of America, et al  v. Wiscon-
sin Employment Relations Board et al (1941) 237 Wis. 164, 295
N.W. 791, where it was held that the Wisconsin Employment Peace
Act, enacted in 1939, was not in conflict with the National
Labor Relation Act.

The right of State regulation consistent with Federal
Law was announced by the Supreme Court of Illinois in the case
of Fansteel Metallurgical Corp. v. Lodge 66 of Amalgamated Ass'n
of Iron, Steel & Tin Workers of North America, et al (1938)
295 Ill. App. 323, 14 N.E. (2d) 991.

The State of New York has a State Labor Relations Act
(N.Y. Laws 1937, C 443, amending Labor Law, Consol. Laws, C31)
the constitutionality of which has been upheld by the highest

court of that State.  Davega City Radio v. State Labor Relations Board (1939) 281 N.Y. 13, 22 N.E. (2d) 145.

The State of Massachusetts has a State Labor Relations Act (Mass. Gen Laws, (Ter. Ed.) C 150 A, amended St. 1938 C. 345 which has the same policy as the National Labor Relations Act, and which the Supreme Judicial Court of Massachusetts has held is a valid exercise of State Legislative power. R.H. White Co. v. Murphy, et al (1942) 38 N.E. (2d) 685.

The power of the states to regulate employers and employees and their activities insofar as such activities affect the economic and general welfare has been sustained under the State and Federal Constitutions as a proper exercise of the police power reserved to each State.  In Fenske Bros. v. Upholsterers' International Union (1934) 358 Illinois 239, 193 N.E. 112, 97 A.L.R. 1318, the Anto-injunction Law of The State of Illinois was attacked as a violation of the Fourteenth Amendment of the Federal Constitution.  In upholding the validity of that statute the Supreme Court of Illinois said:

"It is well settled that the Legislature may, in the exercise of the police power of the state, enact those measures which have a tendency to promote the public comfort, health, safety, morals, or welfare of society. Massie v. Cessna, 239 Ill. 352, 88 N.E. 152, 28 L.R.A. (N.S. 1108, 130 Am. St. Rep. 234; Condon v. Village of Forest Park, 278 Ill. 218, 115 N.E. 825, L.R.A. 1917E, 314.  The police power is considered capable of development and modification within certain limits, so that the powers or governmental control may be adequate and meet changing social and economic conditions.  The power is not circumscribed by precedents arising out of past conditions, but is elastic and capable of expansion in order to keep pace with human progress.  It is not a fixed quantity, but it is the expression of social, economic, and political conditions.  People v. John Doe of Rosehill Cemetery, 334 Ill.  555, 166 N.E. 112; State Public Utilities Comm. v. City of Quincy, 290 Ill. 360, 125 N.E. 374.  In the exercise of this power, the Legislature may enact laws regulating, restraining, or prohibiting anything harmful to the welfare of the people, even though such regulation, restraint, or prohibition interferes with the liberty or property of an individual.  Neither the Fourteenth Amendment to the Federal Constitution nor any provision of the Constitution of this state was designed to interfere with the police power to enact and enforce laws for the protection of the health, peace, morals, or general welfare

of the people.  Powell v. Pennsylvania, 127 U.S. 678,
8 S. Ct. 992, 1257, 32 L. ed. 253; People v. Anderson,
355 Ill. 289, 189 N.E. 338; Town of Chancy's Grove v.
Van Scouoc, 357 Ill. 52, 191 N.E. 289."

In the recent case of Carpenters and Joiners Union
of America, Local No. 213, et al v. Ritter's Cafe, et al
(1942) 315 U.S. 722, 62 St. Ct. 807, 86 L. Ed. 1143, affirming
149 S.W. (2) 1694, error refused, the question involved the
right of peaceful picketing of an employer's restaurant when
the labor dispute involved the issue of employment of non-
union labor on a building which was being constructed for the
same employer at a point a mile and one-half away.  The con-
tract for constructing the building gave the contractor the
right to make his own arrangements regarding the employment
of labor, and not the restaurant owner.  In upholding an injunc-
tion prohibiting the picketing of the restaurant, the Supreme
Court of the United State, speaking through Mr. Justice
Frankfurter, said:

"We must be mindful that "the right of
employers and employees to conduct their economic
affairs and to compete with others for a share in
the products of industry are subject to modification
or qualification in the interests of the society in
which they exist.  This is but an instance of the
power of the State to set the limits of permissible
contest open to industrial combatants.' Thornhill v.
Alabama, 310 U.S. 88, 103, 104, 60 S. Ct. 736, 745,
84 L. Ed. 1093.

"It is not for us to assess the wisdom of
the policy underlying the law of Texas.  Our duty
is at an end when we find that the Fourteenth
Amendment does not deny her the power to enact
that policy into law."

The case of Tigner v. Texas, (1940), 310 U.S. 141, 149,
60 ST. Ct. 879, 84 L. Ed. 1124, rehearing denied 310 U.S. 659,
60 S. Ct. 1092, 84 L. Ed. 1422, affirming 132 S.W. (2) 885,
139 Cr. R. 452, involved the validity of the Texas Anti-trust
statute.  (Art. 1642, Vernon's Annotated Penal Code).  The
law was attacked on the ground that it violated "the equal pro-
tection of the laws" clause of the Fourteenth Amendment in
that it did not "apply to agricultural products or livestock
in the hands of the producer or raiser."  The Supreme Court of
the United States upheld the validity of the law and concluded
that "to write into law the differences between agriculture
and other economic pursuits was within the power of the Texas
Legislature."

This power of regulation and supervision has been extended to unincorporated associations or societies.  People of the State of New York ex rel. George W. Bryant v. Charles F. Zimmerman, et al (1926) 241 N.Y. 405, 150 N.E. 497, 43 A.L.R. 909, affirmed 278 U.S. 63, 73 L. Ed. 184, 63 Sup. Ct. 84. The State of New York had a statute requiring "every existing membership corporation, and every existing unincorporated association having a membership of twenty or more persons, which corporation or association requires an oath as a prerequisite or condition of membership, other than a labor union or a benevolent order mentioned in the benevolent orders Law" to file "with the Secretary of State a sworn copy of its constitution, by-laws, rules, regulations and oath of membership, together with a roster of its membership and a list of its officers for the current year "and providing for penalites.  A member of the Ku Klux Klan was prosecuted for knowingly being a member of an organization which had not complied with the law.  The constitutionality of the Act was attacked on the ground that it violated the "privileges and immunities" provision, "the due process of law" provision and "the equal protection of the law" provision of the Fourteenth Amendment.  The Court dismissed the first contention as not involving a Federal right, the right of joining and remaining a member of an organization being "an incident of State rather than United States citizenship."  As to the second contention the court said"

"The relator's contention under the due process clause is that the statute deprives him of liberty in that it prevents him from exercising his right of membership in the association.  But' his liberty in this regard, like most other personal rights, must yield to the rightful exertion of the police power.  There can be no doubt that under that power the state may prescribe and apply to associations having an oath-bound membership any reasonable regulation calculated to confine their purposes and activities within limits which are consistent with the rights of others and the public welfare.  The requirement in Sec. 53 that each association shall file with the secretary of state a sworn copy of the constitution, oath of membership, etc with a list of members and officers, is such a regulation.  It proceeds on the twofold theory that the state within whose territory and under whose protection the association exists is entitled to be informed of its nature and purpose, of whom it is composed and by whom its activities are conducted, and that requiring this information to be supplied for the public files will operate as an effective or substantial deterrent from the violations of public and private right to which the

association might be tempted if such a disclosure were not required. The requirement is not arbitrary, or oppressive, but reasonable and likely to be of real effect . . .

As to the third contention the Court said:

"The main contention made under the equal protection clause is that the statute discriminates against the Knights of the Ku Klux Klan and other associations in that it excepts from its requirements several associations having oath bound membership, such as labor unions, the Masonic fraternity, the Independent Order of Odd Fellows, the Grand Army of the Republic and the Knights of Columbus . . ."

"We think it plain that the action of the courts below in holding that there was a real and substantial basis for the distinction made between the two sets of associations or orders was right and should not be disturbed.

"Criticism is made of the classification on the further ground that the regulation is confined to associations having a membership of twenty or more persons. Classifications based on numbers is not necessarily unreasonable. There are many instances in which it has been sustained. We think it not unreasonable in this instance. With good reason the legislature may have thought that an association of less than twenty persons would have only a negligible influence and be without the capacity for harm that would make regulation needful."

As to the broad power of the Texas Legislature to make classifications for legislative purposes, see Miller et al. v. El Paso County (1941) 136 Tex. 370, 150 S.W. (2) 1000.

It is no longer necessary as a basis for State regulation for the business or activity to be "affected with a public interest" in the sense that the public as a whole has a direct interest or share in the activity or business. A Nebraska statute (Neb. Comp. St. 1929 Sec. 48-528) fixing maximum fees to be charged by private employment agencies, requiring the issuance of receipts to applicants and a return of fees in the event no employment was obtained was upheld recently by the Supreme Court of the United States. Olson v. Nebraska (1941) 313 U.S. 236, 85 L. Ed. 1305, 61 Sup. Ct. 862, 133 A.L.R. 1500. In that case the Supreme Court referring to businesses "affected with a public interest" said:

"It was said to be so affected if it had been devoted to the public use' and if 'an interest in effect' had been granted 'to the public in that use.' Ribnik v. McBride, supra (277 U.S. 355, 72 L. ed. 915, 48 S. Ct. 545, 56 A.L.R. 1327). That test, labelled by Mr. Justice Holmes in his dissent in the Tyson case (273 U.S. at p. 446, 71 L. ed. 729, 47 S. ct. 426, 58 S. CT., 1236) as 'little more than a fiction,' was discarded in Nebia v. New York, supra (291 U.S. pp. 531-539, 78 L. Ed. 953, 958, 54 S. Ct. 505, 89 A.L.R. 1469). It was there stated that such criteria "are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices,' and that the phrase 'affected with a public interest' can mean 'no more than that an industry, for adequate reason, is subject to control for the public good.' Id. 291 U.S. p. 536, 78 L. ed. 956, 54 S. Ct. 505, 89 A.L.R. 1469. And see the dissenting opinion in Ribnik v. McBride, supra (277 U.S. at p. 359, 72 L. ed. 916, 48 S. Ct. 545, 56 A.L.R. 1327."

The Supreme Court of Texas no doubt considered the authority of the Legislature to act in the furtherance of the general welfare in upholding the constitutionality of the Unemployment Compensation Act (Arts. 5221b-1 to 5221b-22, Vernon's Ann. Civil Statutes) although basing the opinion on the State's taxing power. Friedman v. American Surety Co. of New York, et al (1941) 137 Tex. 149, 151 S.W. (2) 570.

In Exparte Frye (1941) 156 S.W. (2) 531 our Court of Criminal Appeals upheld the anti-violence statute relating to labor disputes (Art. 1621v, Vernon's Ann. Penal Code) against the charge that it violated the constitutional guarantee of "equal protection of the law", "freedom of assembly" and other provisions of our State and Federal Constitutions.

We have considered the case of St. Louis Southwester Ry. Co. v. Griffin (1914) 106 Tex. 477, 171 S.W. 703, L.R.A. 1917B, 1108 in which the Supreme Court of Texas held the "Blacklisting Statute" (Gen Laws, 1908, Ch. 89 p. 160 unconstitutional, but we do not believe that the decision will control any of the questions of constitutionality under H.B. No. 100.

In H.B. 100 the Legislature has recited certain facts and stated that "it is here now declared to (be) the policy of the State, in the exercise of its sovereign constitutional police power, to regulate the activities and affairs of labor unions, their officers, agents, organizers and other representatives." This declaration of policy on behalf of the State

and the finding of facts authorizing such a declaration are matters peculiarly within the province of the Legislature. Harris County Flood Control Dist. v. Mann (1940) 135 Tex. 239, 140 S.W. (2d) 1098. Johnson v. Elliott, Tax Collector (1914) Tex. Civ. App. 168 S.W. 968, error refused. Black v. Hirsch (1921) 246 U.S. 135, 65 L. ed. 865, 41 Sup. Ct. 458, 16 A.L.R. 165.

Upon a consideration of the foregoing authorities it is our opinion that the Act as a whole is within a field which is subject to regulation by the Legislature under the exercise of the State's police power.

The definition of a labor union as contained in Sec. 2(b) of the Act may upon first examination appear to be uncertain but in our opinion the definition is not subject to this objection. The first part of the definition specifically enumerates the various generic terms by which organizations of this nature may be known and includes such associations within the meaning of the  term "labor union" when they are "organized and existing" for definitely specified purposes, towit: "of protecting themselves, and improving their working conditions, wages, or employment relationships in any manner." This is in substance the meaning of a labor union as commonly known and understood, and with slight variation in wording is the definition ordinarily given by the courts. See Words & Phrases Permanent Ed. Vol 24, "Labor Organization" p. 74 and pocket part p. 17. "labor Union p. 77 and pocket part p. 18; Vol. 42, "Trade Union" p. 209. See also Article 5152, R.C.S. 1925 which was first enacted in 1899. The last clause, "but shall not include associations or organizations not commonly regarded as labor unions" does not render the definition ambiguous. As pointed out above, those organizations included in the definition are as a matter of fact commonly regarded as labor unions and this clause was no doubt added by the Legislature through an abundance of precaution.

Section 3 of the Act makes no more stringent requirements of labor unions than those involved in the New York Statute which applied to other unincorporated associations and whose validity was sustained in the case of People of the State of New York ex Rel. George W. Bryant v. Charles F. Zimmermann, et al (1926) 241 N.Y. 465, 150 N.E. 497, 43 A.L.R. 909, affirmed 278 U.S. 63, 73 L. Ed. 184, 63 Sup. Ct. 84.

Section 5 of the Act which provides for the issuance of identification cards to labor organizers is in our opinion a reasonable exercise of the police power by the Legislature. Provisions of somewhat similar nature are found in a number of the regulations by the State under the police power such as

solicitors  or agents for insurance companies, real estate
dealers, and dealers and salesmen under the Securities Act.

Sections 12 et seq. of the Texas Securities Act (Art.
600a, Vernon's Ann. Civ. St.) require the registration of sales-
men and dealers in securities and make it unlawful for persons
not registered as dealers or salesmen to sell or offer for sale
securities in this State.  Such provisions have been upheld by
the Texas Courts.

In affirming a conviction for selling securities with-
out having been registered, the Court of Criminal Appeals in
Atwood v. State (1938) 121 S.W. (2) 353 held that such legis-
lation came within the police power in the following language:

"It was within the police power of the
Legislature to constrain the conduct of dealers
in securities to the end that the public might
be protected against the imposition of unsub-
stantial schemes and securities based upon them".
Hall v. Geiger-Jones Co. 242 U.S. 539, 37 S. Ct.
217, 220, 61 L. Ed. 480, L.R.A. 1917F, 514, Ann.
Cas. 1917 C, 643."

A similar holding was made in Smith v. Fishback (T.C.
A. 1938) 123 S.W. (2) 771, at 778-779, and the Texas Supreme
Court sustained such exercise of the police power in Kadane
v. Clark (1940) 143 S.W. (2) 197.

The apparent purpose of the Legislature in enacting
the provisions of the Act now under consideration was to pro-
tect the public from the impositions, misrepresentations or
fraud of unscrupulous and unauthorized persons purporting
to act in the name of and as the duly authorized representa-
tions of legitimate organized labor.  This section provides a
means of establishing the identity, affiliations and credentials
of those who hold themselves out as labor union organizers.
Not only is it for the protection of the public but it is
designed to afford protection to the union to the end that
persons purporting to act for it are in fact its bona fide
representatives.

We find no constitutional objection to Section 6, pro-
viding for the filing of working agreements with the Secretary
of State, but on the contrary such regulation may be supported
on the basis of the principles enumerated in the cases herein-
above discussed at greater length.

The sections mentioned cover all portions of the Act
which relate to any duties or responsibilities imposed on the
Secretary of State and in our opinion these provisions are

constitutional. Even though some of the other sections may be invalid, it is the well established rule in this State that an Act will not be held invalid as a whole if the invalid portions are severable from that which remains, so that they are complete within themselves and are capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected. 9 Tex. Jur. 472, 474, Secs. 55, 56 and cases cited therein. The Act by its own terms provides that "if any section or part whatsoever . . . shall be held to be invalid . . . such invalidity shall not affect the remaining portions thereof ....." Section 15, H.B. No. 100. Upon consideration of the Act as a whole it is our opinion that the sections pertaining to the duties and responsibilities of the Secretary of State are severable from the remainder of the act and are valid and enforceable regardless of the validity of the remaining sections.

There are other sections of this Act, however, which present serious constitutional objections and we consider it proper at this time to express our views thereon.

Section 4 of the Act provides:

"Sec. 4. Officers. All officers, agents, organizers, and representatives of such labor union shall be elected by majority vote of the members present and participating; provided, however, that labor unions, if they so desire, may require more than a majority vote for election of any officer, agent, organizer of representative, and may take any such vote to the entire membership by mailed ballots. Such election shall be held at least once each year, and the determination taken by secret ballot, of which election the membership shall be given at least seven (7) days' notice by written or printed notice mailed to the member's last known address, or by posting notice of such election in a place public to the membership, or by announcement at a regular stated meeting of the union, which ever is most convenient to the union. The result of such election when held shall be ascertained and declared by the president and the secretary at the time in the presence of the members or delegates participating.

"Provided, the requirement for annual elections herein made, or the methods of holding same, shall not apply to any labor union that

for four (4) years prior to the effective date
of the law shall have held its elections for
officers, delegates and the like representa-
tives less frequently than annually but which
have held such elections either every three (3)
years or every four(4) years under their con-
stitution, bylaws, or other organization rules,
and which unions have during the last ten (10)
years charged not more than Ten Dollars ($10)
initiation fee to members."

The requirements of this section, briefly stated, are
that all unions shall:

1.  Elect their officers, agents, organizers and rep-
resentatives by majority vote of the members present and,
participating.

2.  Hold elections for such purposes at least once a
year.

3.  Take the vote of their members by secret ballot.

4.  Give at least seven days written notice of the
holding of such election to each member.

5.  Declare the result of the election in the presence
of the members participating.

It has been said that the police power of the State
extends to all the great public needs, and that the liberty
of the individual must yield to reasonable regulation in the
interest of the public health, safety, welfare, and morals.
None of the liberties vouchsafed and protected by the Consti-
tution of the State  and of the United States are absolutes.
Where a legitimate public interest is involved, each of such
liberties must be subject to reasonable regulation to the ex-
tent that the interest of the public may require.  Even so
specific a constitutional guaranty as that of free speech does
not grant an absolute immunity from all restraint.  Any other
doctrine would transform liberty into license and utterly des-
troy the effectiveness of any organized civil government.

This does not mean that the liberties of the individual
may be impinged upon or destroyed at will.  The interest in-
volved of organized society must be sufficient to justify,
reasonably, curtailing the liberties of the individual in the
manner and to the extent involved.  Unreasonable or oppressive
regulation is not tolerated, under our Constitution.

We think it cannot be plausibly contended that the regulation of labor unions embodied in Section 4 violates these principles. The purpose of the section is fairly apparent. It is designed to insure that the members of labor organizations shall be afforded reasonable opportunity to exert a continuing control over the functioning of their organization. The means provided for this purpose are fair and reasonable, not arbitrary or oppressive, and are fairly calculated to achieve an end sought by the Legislature. Likewise, it cannot be said that the public has no sufficient interest to justify such regulation. It is matter of common knowledge that labor unions are in position to, and do, exert a tremendous influence upon matters directly affecting the economic welfare of the people at large. No less are they in position to exert a considerable control over their members in matters directly affecting their economic welfare. In view of these considerations, we think it clear that the State has a sufficient interest in their operations to justify its requirements reasonably designed and calculated to insure control, continuing in nature, over the affairs of their organization by a majority of the union membership.

It follows that Section 4 is not, in our opinion, unconstitutional on the ground that it is an unwarranted or unreasonable invasion of the liberties of these regulated by its terms. Nevertheless, the entire section must fall, for reasons which will be stated below.

It is to be noted that, in the second paragraph of the section, the Legislature undertakes to relieve from the obligations imposed by the first paragraph upon all labor unions, certain labor unions which, for four years prior to the effective date of the act, held their elections either every three or every four years under their organization rules, and which during the last ten years have charged not more than $10.00 as initiation fee to members.

Under the equal protection of the laws clause of our State and Federal Constitutions, reasonable classification is permissible, but classification, to be valid, must rest upon substantial differences germane to the objects and purposes of the law. The legislature cannot take what may be termed a "natural class," split that class in two upon considerations which, looking to the objects and purposes of the law, do not fairly serve to distinguish the two minor classes, and apply the law to the one while exempting the other from its provisions. This is arbitrary selection, not permissible classification. 12 Am. Jur., Constitutional Law, Secs. 478, 479, 480, 481, 9 Tex. Jur., Constitutional Law, Secs. 119, 120; Lossing v. Hughes, 244 S.W. 556; Davis v. Holland, 168 S.W. 11.

Do the characteristics made the basis for exempting certain unions from the operation of Section 4 suggest such material differences as would fairly and reasonably justify their exclusion from the policy which the legislature has seen fit to apply to all other unions? We are of the opinion they do not. The fact that certain unions may during the last four years have held elections under their rules either every three or every four years and over the last ten years have charged not more than $10.00 as initiation fee to members does not reasonably indicate an absence of those conditions which lead the legislature to require of other unions annual elections, majority vote, secret ballot, notice of election, and announcement of its result. The exemption takes no account of the fact that such unions may not give notice of their elections or announce their result, or vote by secret ballot, or elect their officers by majority vote. Nor does it take into account the fact that such unions, under the terms of the proviso, would continue to be exempt from the application of Section 4, though after the effective date of the act they should charge initiation fees in excess of $10.00 and change their time for holding elections to every ten or fifteen years. The arbitrary character of the classification is further emphasized by noting that a union holding its elections every two years over the last ten years and during such time charging not more than $10.00 initiation fee is NOT exempt from Section 4, though its election periods approach more nearly the maximum determined by the legislature to be reasonable to insure effective continuing control of the union by the membership, than those holding their elections every three or every four years. In short, there is nothing in the bases of classification selected by the Legislature which fairly and reasonably serves to justify the Legislative failure to apply to the unions possessing them provisions of the law designed to insure continuing control over unions by a majority of their members.

The provision containing the exemption, then, is void. And, since to enforce the provisions of Section 4 against such unions would be to include within its scope unions expressly exempted by the Legislature, such provision is not severable from the remainder of the Section. The result is that the entire section must fall. For, if by striking out a void exception, proviso, or other restrictive clause, the remainder by reason of its generality will have a broader scope as to subject matter or territory, its operation would not be in accord with the expressed legislative intent, and the whole is made void by the invalidity of the part. Anderson v. Wood, 137 Tex. 201, 152 S.W. (2d) 1084.

Section 7 of the Act provides:

"Sec. 7. Fees, Dues, Fines and Assessments. It shall be unlawful for any labor union, its officers, agent or any member to make any charge or exaction, or to receive any moneys for initiation fees, dues, fines, assessments, or other pecuniary exactions, which will create a fund in excess of the reasonable requirements of such union, in carrying out its lawful purpose or activities, if such fees, dues, fines, assessments, or other pecuniary exactions create, or will create, an undue hardship on the applicant for initiation to the union, or upon the union members. Nothing in this Section shall be deemed or construed to prevent the collection by a labor union of dues or assessments for purposes which are beneficial to the members of the union according to the established practice, and/or to maintain funds or make investments of funds for such beneficial purposes. Neither shall this Section be construed to prevent dues, collections or other assessments for old age benefits, death and burial benefits, hospitalization, unemployment, health and accident, retirement or other forms of mutual insurance, for legislative representation, grievance committee, or for gifts, floral offerings, or other charitable purposes, or any other legitimate purposes when the union engages in or decides to engage in such a field or practice; provided that the members contributing share or can reasonably expect to share in the benefits for which they are assessed; neither shall this Section be construed to prevent assessments, dues, or other collections, except initiation fees, to be placed in the funds or as a part of the funds of the union for the use by the union in paying its members while such members are on a strike; provided such funds shall remain under control of the labor union members. This Section shall be liberally construed, however, to prevent excessive initiation fees."

Summarized, this section prohibits the collection of charges in excess of those reasonably required to carry on the lawful functions of the union IF (and only if) such unnecessary charges create or will create an "undue hardship" on members or applicants for membership. For violations of this section, as for violations of other sections of the Act, the legislature has undertaken to impose civil penalties upon the union and criminal penalties upon individuals.

Due process of law clauses in our State and Federal

Constitutions have long been construed to require an element of certainty in the commands of statutes. This requirement is particularly stringent, insofar as statutes imposing civil and criminal penalties are concerned. "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. International Harvester Co. v. Kentucky, 234 U.S. 216, 221, 58 L. Ed. 1284, 1287, 34 Sup. Ct. Rep. 583; Collins v. Kentucky, 234 U.S. 634, 638, 58 L. Ed. 1510, 1511, 34 Sup. Ct. Rep. 924." Connally v. General Construction Co., 70 L. Ed. 323 (wherein the court held that a statute which required a contractor, under penalty, to pay his employees "not less than the current rate of per diem wages in the locality where the work is performed" is so uncertain as to deprive contractors of property without due process of law.)

The cases applying this principle of constitutional law are many. A few examples will suffice to illustrate the nature of the holdings.

In United States v. Cohan Grocery Co., 255 U.S. 81, 65 L. Ed. 516, 14 A.L.R. 1045, the Supreme Court of the United States held that an Act of Congress imposing a penalty on any person who should make "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" was too indefinite and uncertain, fixing no ascertainable standard of guilt.

In U.S. v. Capital Traction Co., 34 App. D.C. 592, 19 Ann. Cas. 68, a statute making it an offense for a street railway company to run an insufficient number of cars to accomodate passengers "without crowding" was held void for want of sufficient certainty.

In Ex parte Slaughter, 92 Crim. Rep. 212, 243 S.W. 478, our Court of Criminal Appeals held void for lack of certainty a statute forbidding driving of motor vehicles on any public highway "where the territory contiguous thereto is closely built up" at a speed in excess of 18 miles per hour.

In Griffin v. State, 86 Tex. Crim. R. 498, 218 S.W. 494, the same court held invalid a statute which prohibited the operation of motor vehicles at night with headlights

which projected forward "a light of such glare and brilliancy as to seriously interfere with the sight of, or temporarily blind the vision of, the driver of a vehicle approaching from the opposite direction."

In Francis v. Allen, (Ariz.) 96 P. (2d) 277, the court held to be too uncertain the provision of an act regulating transportation agencies which required that "an agent shall not offer transportation by any carrier which is conducting its business in a manner contrary to the public interest."

In Ex parte Peppers, (Cal.) 209 P. 896, a statute prohibiting the shipment of oranges "when frosted to the extent of endangering the reputation of the citrus industry" was held to be too uncertain to form the basis of a criminal prosecution. We quote briefly from the opinion:

> ". . . it does not purport to forbid the shipment of all the frosted oranges. It thus concedes that oranges may be frosted and may still be the proper subject of shipment and consumption without in any way 'endangering the reputation of the citrus industry.' What defect then shall render certain of such oranges unfit for shipment as 'endangering the reputation of the citrus industry?' What is the reputation of the citrus industy? Is it for the production and shipment of oranges of a certain standard of color, or of sweetness, or of juiciness, or of palatability? How is the producer whose oranges have been touched with frost to know, from the terms of the act, whether or when he will be violating it in offering his fruit for shipment? . . . ."

We have pointed out that Section 7 does not prohibit all charges in excess of the reasonable requirements of the union, but only those charges in excess of the reasonable requirements of the union which create or will create an undue hardship upon members or applicants for membership. Just as in the "orange case," cited above, the fact alone that oranges were frosted did not prevent their shipment, so in this Act the fact that charges are in excess of the reasonable requirements of the union will not render illegal their collection. The charge must not only be in excess of the reasonable requirements of the union; it must also create, presently, or in the future (i.e. "will create") "undue hardship", on the members or applicants against whom it is assessed.

In our opinion, this provision wholly fails to provide a standard sufficient that those subject to its terms may reason-

ably determine what conduct on their part will render them sub-
ject to the penalties of the Act. By what standard is one to
determine when an excessive charge creates (or will create) a
hardship on the members or applicants? But the fact that the
charge creates a hardship is not alone sufficient to condemn
it - the hardship must be "undue"! What factors are to be
taken into consideration in determining whether the hardship
is "undue"? Not the fact that the charge is excessive in
relation to the needs of the organization, for the act impliedly
recognizes the right to collect excessive charges if they do
not create, either presently or in the future, an "undue hard-
ship" upon the members or applicants. The fact of "undue
hardship" then, is to be determined, not by the nature of the
charge, but by its effect upon the members or applicants.
The requirement is similar to that of the statute involved in
the Griffin case, cited above, wherein the court observed
that the statute would require the driver of the motor vehicle
to judge of the effect of his lights upon the vision of each
approaching driver, which effect would necessarily vary with
the physical peculiarities of such driver and the circumstances
of the occasion of meeting.

In our opinion, upon the authorities cited, Section 7
of this Act is so indefinite and uncertain in its definition
of the offense as to violate the due process clause of the
State and Federal Constitutions.

Section 4a of the Act makes it unlawful for any alien
"to serve as an officer or official of a labor union or as a
labor organizer" as defined in the Act. With reference to
this provision the analogous cases are in apparent conflict.
Some courts have held invalid, restrictions based upon resi-
dence or citizenship. Others have upheld such provisions.
See 2 Am. Jur. 468-472 and cases cited therein. From a con-
stitutional standpoint we believe the courts will uphold this
provision in H.B. No. 100.

This question may also involve the civil rights of
aliens under existing treaties between the United States and
the country in which the particular alien is a citizen. See
Magnani v. Harnett, (1939) 14 N.Y.S. (2d) 107, 257 App. Div.
487, affd. (1940) 25 N.E. (2d) 395, certiorari denied, 60
S. Ct. 1089, 301 U.S. 642, 84 L. Ed. 1490. For present pur-
poses we have not undertaken to go into this matter.

Section 10a of the Act provides that a member of the
armed forces of the United States, who is a member of a union
and who is unable to pay back dues and assessments shall be
reinstated without payment. We do not believe that the
Legislature has the power to compel the forgiveness of a debt

or interfere with the union's right of contract in this respect. Article I, Section 16, Texas Constitution; Langever v. Miller (Sup. Ct. 1934) 124 Tex. 80, 76 S.W. (2d) 1025, 96 A.L.R. 836.

                              Very truly yours

                              s/Gerald C. Mann
                               Gerald C. Mann
                              ATTORNEY GENERAL OF TEXAS

GCM:db:wc

APPROVED APR 12, 1943

This Opinion Considered and Approved in Limited Conference